**F. H. McGRAW & CO., Inc., v. SHERMAN PLASTERING CO., Inc., et als.**

Civil Action No. 368.

District Court, D. Connecticut.

April 10, 1943.

Watrous, Hewitt, Gumbart & Corbin, by James W. Cooper, all of New Haven, Conn., and Joseph Lotterman, of New York City, for plaintiff.

Benjamin Slade, of New Haven, Conn., for Sherman Plastering Co.

Parmelee & Thompson, by Herbert S. MacDonald, all of New Haven, for Aetna Casualty & Surety Co.

Charles H. Levitt, of New York City, and Richman & Silver, of New Haven, Conn., for John T. D. Blackburn, Inc.

Walter G. Schelker, Jr., of Dills, Muecke, Schelker & Levinson, all of New York City, and Richman & Silver, of New Haven, Conn., for Milcor Steel Co.

HINCKS, District Judge.

This is an action of interpleader brought by F. H. McGraw & Company, the general contractor for the construction of a State Hospital at Newtown, Fairfield County, Connecticut, against Sherman Plastering Company, Inc., a subcontractor, and John T. D. Blackburn, Inc., and Milcor Steel Company, both materialmen of the Sherman Company, all of whom were named as adverse claimants to a fund of some $5,000 claimed to comprise the unpaid balance in the plaintiff's hands of the payments promised to the Sherman Company under the subcontract. Other defendants, citizens both of New York and Connecticut named in the complaint, were defaulted for failure to plead.

The defendants Blackburn, Inc., and Milcor Steel each answered and filed both a counterclaim against the plaintiff and a cross-complaint against the Aetna Casualty & Surety Company, which as the surety on the plaintiff's bond they had cited in as a third-party defendant.

### Findings.

#### Jurisdictional and General Facts.

1. F. H. McGraw & Company, Inc. (hereinafter referred to as McGraw), is a New Jersey corporation and McGraw at all times mentioned in the complaint was engaged in business as a general contractor and builder, authorized to do business in Connecticut.

2. The Aetna Casualty and Surety Company (hereinafter referred to as Aetna) is a Connecticut corporation, and is authorized to engage in the business of a surety company in Connecticut.

3. Milcor Steel Company (hereinafter referred to as Milcor) is a Delaware corporation.

4. John T. D. Blackburn, Inc. (hereinafter referred to as Blackburn) is a New York corporation.

5. Sherman Plastering Company, Inc. (hereinafter referred to as Sherman) is a New York corporation.

6. On August 16, 1938, McGraw was awarded by the State of Connecticut the contract for the construction of the Continued Treatment Units, Fairfield State Hospital, Newtown, Connecticut, hereinafter referred to as the "Fairfield job."

7. On August 16, 1938, McGraw, as principal, and Aetna, as surety, executed and delivered to the State of Connecticut a bond in the principal amount of $1,446,-000 to secure stated obligations of McGraw under its contract with the State.

8. Said bond has been and now is held by the Commissioner of Public Works of the State of Connecticut for the use and benefit of materialmen on the said Fairfield job.

9. The condition of said bond is as follows:

"Now therefore, if the said Principal shall promptly pay for all materials furnished and labor supplied or performed in the prosecution of the work included in and under the aforesaid contract whether or not the material or labor enter into and becomes

a component part of the real asset, then this obligation shall be null and void, otherwise it shall remain and be in full force and effect.

"Any party, whether a subcontractor or otherwise, who furnishes materials or supplies or perform labor or services in the prosecution of the work under this contract and who is not paid therefor, may bring a suit on this bond in the name of the State, prosecute the same to a final judgment and have execution thereon for such sum or sums as may be justly due, provided, however, that the State shall not be liable to furnish counsel nor for the payment of any costs or expenses of any such suit."

10. On September 1, 1938, McGraw subcontracted in writing, Exhibit 2, with Sherman for the latter to do certain work, and to furnish certain materials upon the Fairfield job, including the metal furring, metal lathing, corner beads, base beads and plastering. Under this subcontract Sherman promised to furnish labor and material for the Fairfield job "in accordance with the specifications, general conditions," etc., of McGraw's principal contract with the State of Connecticut. And by the terms of the general conditions of the principal contract every subcontractor was to agree "to be bound to the contractor * * * and to assume toward him all the obligations and responsibilities that he * * * assumes toward the owner." And the owner, i. e., the State of Connecticut, reserved the right not only to withhold from the contractor so much of the approved payments due him as might be necessary "to assure the payment of just claims then due and unpaid of any person supplying labor or materials for the work" but also to terminate the contract if "the contractor shall fail to make prompt payment to persons supplying labor or materials for the work." Moreover, the subcontract contained an express provision requiring Sherman "in case of any lien or liens upon said work or materials by reason of any indebtedness for labor and materials accrued against the contractor (Sherman), to pay the same or cause the same to be discharged by giving a bond."

11. McGraw discharged all its obligations to Sherman under its subcontract but withheld payment of the sum of $5,382.90 which sum upon the bringing of this action McGraw deposited in the registry of the court.

12. Blackburn and Milcor both supplied materials to Sherman which were used under Sherman's contract with McGraw in the Fairfield job and each has made claim in excess of $5,382.90 against McGraw and against Aetna on account of the materials thus sold and used.

13. Prior to action brought, neither Sherman nor Milcor made any claim against McGraw to moneys claimed to be due from McGraw under its subcontract with Sherman described in Paragraph 10 hereof. By counterclaim and third-party complaint both claimed against McGraw and Aetna under the bond referred to in Paragraphs 7, 8 and 9 hereof.

14. Prior to action brought, Blackburn made claim against McGraw for moneys claimed to be due and owing from McGraw to Sherman under the subcontract. And by counterclaim and third-party complaint herein Blackburn also is pressing its claim against McGraw and Aetna under said bond.

Facts Bearing Particularly upon McGraw-Milcor Relationship.

15. The materials furnished by Milcor as set forth in Paragraph 12 were delivered on the job in Connecticut between August 30, 1939 and October, 1939, and were sold to Sherman at prices which in the aggregate amounted to $6,372.51.

16. No part of the purchase price therefor has been paid, and Sherman is still indebted to Milcor therefor.

Facts Bearing Particularly upon McGraw-Blackburn Relationship.

17. The materials furnished by Blackburn as set forth in Paragraph 12 were delivered on the job in Connecticut between March 24, 1939, and January 9, 1940. Those delivered prior to July 19, 1939, were fully paid for by Sherman and are not involved in this action. Those delivered after July 19, 1939, were sold to Sherman at prices which in the aggregate (exclusive of an item of $68. for materials returned) amounted to $9,009.64.

18. The Blackburn sales were made on orders made and accepted in the State of New York, and possession of the goods sold passed from Blackburn or its agent in New York or Ohio to common carriers through whom the goods were delivered to Sherman on the job in Connecticut. From its contract as interpreted in the light of

these surrounding circumstances, I find that the parties intended that Sherman's performance was to be by making payment for the goods to Blackburn at Blackburn's office in New. York.

19. Between June, 1938, and September, 1941, Blackburn furnished other materials to Sherman for jobs other than the Fairfield job.

20. Subsequent to July 19, 1939, Sherman made numerous payments to Blackburn without then directing whether said payments should be applied against its indebtedness for the material furnished to the Fairfield job or against its indebtedness for the material furnished to Sherman's other jobs.

21. At the time of said payments Blackburn maintained in its books a single running account of all its sales to Sherman, including sales for the Fairfield job and sales for numerous other jobs, and upon the receipt of the payments by Sherman as aforesaid credited said payments to Sherman on said running account without making any allocation of any of said payments to any particular job.

22. If the payments described in Paragraph 20 be deemed all applied against the earliest sales made by Blackburn to Sherman then unpaid, Sherman's indebtedness to Blackburn on account of material furnished for the Fairfield job was fully paid and discharged. But if Sherman's said payments be deemed all applied against indebtedness for material furnished for jobs other than the Fairfield job, then Blackburn's claim of $9,009.64 for the material furnished to the Fairfield job remains wholly unpaid.

23. There is no proof that prior to January 22, 1940, Blackburn manifested an intent to apply the several payments theretofore made by Sherman to Sherman's indebtedness on account of specific sales of material used elsewhere than in the Fairfield job. On January 24, 1940, at Sherman's request —indeed at Sherman's instigation—Blackburn first formulated an intent to apply all payments received from Sherman subsequent to July 19, 1939, to jobs other than the Fairfield job and on the strength of such allocations notified McGraw by letter that its account against Sherman on account of the Fairfield job was unpaid to the extent ·of $8,640.16. But neither then nor thereafter until long after this action had been instituted did Blackburn have the data which would enable it to allocate each payment theretofore received from Sherman against specific sales theretofore made to Sherman.

Facts Bearing Particularly on the McGraw-U. S. Relationship.

24. On July 14, 1941, social security taxes in the amount of $6,646.30, plus interest, were duly assessed against Sherman. Thereafter notice and demand duly issued to the taxpayer. And on July 30, 1941, a notice of tax lien was duly filed with the Clerk of this Court. In 1940, the taxpayer was insolvent and made an assignment for the benefit of creditors and at the time of trial was wholly without assets. Thereafter the United States moved to intervene in this action to enforce its claim for said taxes due from Sherman against the fund deposited in the registry of the court. By order of December 16, 1941, it was admitted as an intervenor and filed its cross-complaint asserting a prior claim to said fund for the satisfaction of said taxes.

### Opinion.

### Milcor Claim.

██ McGraw and Aetna dispute this claim upon the contention that Milcor's claim against Sherman had been assigned to the American Credit Indemnity Company with which Milcor had a policy of credit insurance. To support the contention, McGraw points to certain circumstantial evidence. It insists that the fact that after Milcor refused, when Sherman's account was in arrears, to extend credit to Sherman it thereafter did extend fresh credit, indicates that its claim on account of the Fairfield job had been paid by the Indemnity Company. It argues that authority given by Milcor to the Indemnity Company to negotiate with Sherman for a settlement of the account imports that the claim had been irrevocably assigned to the Indemnity Company.

No such far-fetched inferences are justified nor is the aggregate effect of such evidence sufficient to disturb my finding that Milcor is still the unfortunate owner of this ancient unpaid claim. That the Indemnity Company attempted to collect from Sherman, and thereby to escape a potential claim under its policy, does not import that it was acting as owner of the claim.

Milcor is entitled to recover against the obligors on the bond in the principal amount of $6,372.51.

### Blackburn Claim.

This claim is for price of goods sold to Sherman for the Fairfield job. The claim is valid, of course, only if it is still unpaid. It is indeed unpaid if payments made by Sherman subsequent to July 19, 1939, were in legal effect applied by Blackburn against Sherman's indebtedness for material furnished for jobs other than the Fairfield job. It is thus necessary to determine at the outset what law governs the effectiveness of those applications.

McGraw contends that the law of Connecticut controls because the principal contract provided for the construction of a public building in Connecticut and is covered by a bond required by the Public Acts of Connecticut and it is upon this bond that the claim is predicated. I agree that all rights created by the bond must be determined by the law of Connecticut. Thus Blackburn, which was not a party to the bond, owes its right to sue on the bond to the law of Connecticut which authorizes actions by third-party beneficiaries. Cf. Byram Lumber & Supply Co. v. Page, 109 Conn. 256, 146 A. 293.

But Blackburn's right to payment arises not from the bond but from its contract with Sherman. That contract must determine whether or not the right which it created has been discharged by payment. If so, it has no claim at all; if not, it has a claim which is enforceable against McGraw and Aetna under the bond.

The bond is conditioned upon payment "for all materials furnished * * * in the prosecution of the work." It secures "any party, whether a subcontractor or otherwise, who furnished materials * * * and who is not paid therefor." Read in the light of the principal contract which is incorporated into its terms, the bond clearly contemplated that the flow of materials to the job would be accomplished by extraneous contracts such as that between Blackburn and Sherman. The bond did not purport to shape or limit all the rights created by these contracts. Plainly it must be construed as intending that the rights of materialmen and the discharge of those rights should be determined under the law applicable to the contracts creating the rights and

that the obligors should stand liable only for the discharge of such rights as thus determined.

Since the Sherman-Blackburn contract was made in New York and Sherman's performance thereunder was to be by payment in New York, the law of New York must determine whether Blackburn's right under the contract has been discharged. This conclusion follows from a proper interpretation of the bond: there is present no question involving a conflict of laws.

If, however, the point could be deemed to raise a conflict of laws, the rule of the Restatement of Conflict of Laws, Sec. 368, would control. "The law of the place of performance governs the application of a payment to one or another of several debts payable there by the person making the payment to the person receiving it." Here the debts involved were payable at Blackburn's office in New York and the place of performance was New York.

Under the law of New York, it is plain that in cases of running accounts when the debtor in making a payment fails to indicate how he wishes the payment to be applied, the debtor is without power thereafter to direct the application but the creditor may make the application as his interest shall suggest. Shipsey v. Bowery National Bank, 59 N.Y. 485; Sheppard v. Steele, 43 N.Y. 52, 3 Am.Rep. 660; Mack v. Colleran, 136 N.Y. 617, 32 N.E. 604. Indeed, this rule of law seems not to be peculiar to New York; it is widely recognized elsewhere. A. L. I. Restatement of Contracts, Sec. 387(b); Williston on Contracts (Rev.Ed.1938) Sec. 1796.

To be sure, the Restatement (Sec. 387(b)) specifies that in such cases the creditor must *manifest his intention* to make his specific application "within a reasonable time." But the New York Annotations to the Restatement note that this limitation is not in accord with the law of New York, relying largely upon Bank of California v. Webb, 94 N.Y. 467, and Wanamaker v. Powers, 102 App.Div. 485, 93 N.Y.S. 19. In the Bank of California case, it was held that the creditor's application was effective though not made until over a year after action brought.

Perhaps the New York rule can be reconciled with the language of the Restate-

ment if "a reasonable time" for the specific application be construed, as the New York cases seem to construe it, as being the period of time within which a specific application may be made without injury to the position of the debtor. This view is in harmony with the rule that where neither debtor nor creditor makes a specific application the court will make the application to the oldest unpaid debt unless the equities of the particular case clearly indicate that some other application is required in justice. Carson v. Federal Reserve Bank, 254 N.Y. 218, 172 N.E. 475, 70 A.L.R. 435; Restatement, Secs. 387(c), 394. It is in harmony also with the trend of the common law to favor the creditor when there are no impelling equities of the debtor which interpose. Williston, Sec. 1800, Cf. Dairymen's League Co-operative Ass'n v. Hartford Accident & Indemnity Co., 252 App.Div. 527, 300 N.Y.S. 431, 436. Why indeed should the creditor not be allowed even after action brought to make a specific application to his own advantage if the debtor is no worse off thereby than if the application had been earlier made? In this sense, perhaps, an application even though long delayed may be deemed to have been made within a reasonable time.

■ Applying, then, the New York rule to the facts of this case, I hold that Blackburn's counterclaim and cross-complaint herein must be treated as a specific allocation of the Sherman payments to the price of goods furnished to jobs other than the Fairfield job not made too late to have effect. Certainly Sherman, the debtor, was not injured by any lack of timeliness in the making of the application: on the contrary, it has sought, belatedly to be sure, to accomplish the very application which Blackburn asserts.

To be sure, it may be that when a debtor, without direction, makes a payment with money which he is under fiduciary or contractual obligation to apply specifically to the discharge of one out of several debts, the creditor, if having knowledge not only of the source of the money but also of the debtor's obligation with respect thereto, is limited in his power of application and must apply the payment consistently with the debtor's obligation. Restatement, Sec. 389 (e); Williston, 2d Ed., Sec. 1804.

But this is not such a case. Here the money received by Sherman from McGraw became Sherman's and Sherman, notwithstanding its obligation to McGraw to pay its materialmen out of its general estate, was under no obligation to apply *that particular money* received from McGraw to the discharge of its indebtedness to materialmen. Sheppard v. Steele and Mack v. Colleran, supra.

■ Nor can there be any question under the facts here as to whether Blackburn did indeed eventually make a specific allocation. For by its very counterclaim and cross-complaint herein Blackburn sufficiently manifested its intention to make the application which it asserts. Indeed, I think that under the New York rule Blackburn's letter of January 24, 1940 (Findings, Par. 23) the contents of which had already been disclosed to Sherman, was sufficient to accomplish the application asserted.

McGraw and Aetna seem to have assumed that the application could only be made by entries on original books of record showing the specific application asserted. If this assumption be sound in law, it is true that Blackburn cannot prevail. Neither in January, 1940, nor when this action was brought, nor indeed when it filed its cross-complaint and counterclaim herein, were all the payments received from Sherman shown in Blackburn's books as specifically applied against goods furnished for specific jobs.

■ But under the rule of the Restatement, Sec. 391, there is nothing to require that a specific application by a creditor to be effective must be recorded on the creditor's books; it is enough that the creditor notify the debtor or give him some manifestation indicating his intention to make the application. And the law of New York on the point is no less liberal than the rule of the Restatement. Cf. Bank of California v. Webb, supra. True enough, book entries may serve as evidence of specific applications. Van Rensselaer's Ex'rs v. Roberts, 5 Denio, N.Y., 470. But I find no New York case which even suggests that supporting book entries are indispensable. Indeed, in Dairymen's League Co-operative Ass'n v. Hartford Accident & Indemnity Co., supra, a specific application by the creditor to items covered by an indemnity bond seems to have been inferred from the bare fact that the creditor would not have required the debtor to furnish the bond unless it had intended to make such applications.

It is true that there seems to be a dearth of cases in New York which discuss just how the creditor may exercise his power of application. The dearth, however, may plausibly be attributed to the liberal rule in New York whereby the application is not required to be made before the bringing of the action. Since the assertion of an application in advance of litigation is not required, an application asserted in the complaint seems generally to have been accepted without contest or discussion as a sufficient manifestation of the creditor's intent. Cf. Shipsey v. Bowery National Bank, supra, and Mack v. Colleran, supra.

█ I do not overlook the evidence that shortly after Blackburn's letter of January 24, 1940, McGraw obtained from Blackburn's bookkeeper, Legge, a statement (Exhibit 25) which implied that a somewhat different application, and one less favorable to Blackburn, had been made than that now asserted. But Blackburn's books contain no more support for Legge's alleged allocation than for Blackburn's. Nor was there evidence that Legge, the bookkeeper had authority to bind his employer by making an allocation even if he so intended. Plainly a statement, so elicited from the employee in the absence and without the authority of the employer, cannot prevail over contrary manifestations of intention theretofore and thereafter made by the employer.

█ Indeed, for Blackburn to prevail, there was no need for it to show in detail, as it attempted, to just what jobs, other than the Fairfield job, it applied each payment. Having shown that the aggregate amount of Sherman's indebtedness on the other jobs was sufficient to absorb the payments which gave rise to this controversy, and having in its counterclaim and cross-complaint—not to mention its letter of January 24, 1940—manifested an intention to apply the payments elsewhere than to the Fairfield job, it was enough. For a debtor, by seasonable direction may require, simply, that all its payments shall be allocated elsewhere than to a specified debt. Restatement, Sec. 387, Comment (i). On principle, a creditor should have the same power. So here, Blackburn's expressed intention to exclude the Fairfield debt from participation in the asserted allocation, was effective,—coupled as it was by evidence that the aggregate indebtedness on the other jobs was sufficient to absorb all payments made.

█ Blackburn's letter of January 24, 1940, claimed somewhat less than the debt as established by the proofs. But this minor variance is of little significance. Even if the variance is due to some modification in the application theretofore made, the modification was assented to by Sherman, at least impliedly, and hence is effective. Restatement, Sec. 392. Louis v. Bauer, 33 App.Div. 287, 53 N.Y.S. 985.

I hold, therefore, that Blackburn is entitled to recover in the principal sum of $9,009.64.

I have doubt, however, whether after such a long-delayed application of Sherman's payments Blackburn is entitled to interest. If the point is pressed, the parties may be heard on that issue at the settlement of the decree.

### Claim of the United States.

Under the Internal Revenue Code, Sec. 3670, 26 U.S.C.A. Int.Rev.Code, § 3670, it is provided: "If any person liable to pay any tax neglects or refuses to pay the same after demand, the amount * * * shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person." And under Sec. 3671 of the Code, 26 U.S.C.A. Int.Rev.Code, § 3671, it is provided that the lien in favor of the Government "shall arise at the time the assessment list was received by the collector."

Sherman was and is indebted to the United States in the principal sum of $6,646.30 on account of Social Security taxes. The sum was assessed against Sherman on a list sent to the Collector on July 14, 1941. As a result, the Government claims that the moneys paid into court constituted "property" of Sherman subject to lien in favor of the Government. And by virtue of this asserted lien and the insolvency of Sherman, the Government claims a right to the fund in court prior to that of any of the parties hereto.

But never since the asserted lien was claimed to have attached did Sherman have any "property" or "right to property," within the meaning of Sec. 3670 of the Code, arising from its subcontract with McGraw. See Finding, Par. 10. For by express provision incorporated into the subcontract by reference, the State might treat the failure of prompt payment to materialmen as a breach of the principal contract. And just as McGraw, under the principal contract,

was obligated for the prompt payment of materialmen generally, so Sherman under its subcontract with McGraw was obligated to make prompt payment to its materialmen.

And even if it were impossible to spell out in the subcontract an express obligation whereby Sherman was to pay its own materialmen, from the surrounding circumstances such an obligation must needs be implied. In the light of prevailing business practice, it would be preposterous to infer a mutual intent that McGraw should obligate itself to pay Sherman $80,000 for labor and material not paid for. A contrary intent is clearly to be inferred. Sherman dealt with the materialmen on its own responsibility. The materialmen consistently billed Sherman, not McGraw. And Sherman to the extent of its ability did indeed discharge the claims of its materialmen.

We have, therefore, this situation: Under the subcontract, in exchange for a performance on the part of McGraw taking the form of stipulated payments, McGraw was entitled to a two-fold performance on the part of Sherman, viz., (1) the furnishing of the stipulated labor and material and (2) the prompt payment by Sherman for the stipulated labor and material. Assuming, and it is not disputed, that Sherman furnished the labor and material, nevertheless at least to the extent that Sherman failed to pay Blackburn and Milcor there has been a failure of consideration on the part of Sherman under the subcontract. And this failure of consideration at all times has been available to McGraw as a defense pro tanto, or by way of recoupment, to any claim which Sherman might make against McGraw on the subcontract. Williston on Contracts, 2nd Ed., Par. 813, et seq., 883; Restatement of Contracts, Sec. 274; Tice v. Moore, 82 Conn. 244, 73 A. 133, 17 Ann.Cas. 113.

The case is also within the rule of Sec. 270 of the Restatement. For under the contract McGraw was privileged to withhold 10% ($8,000) of the contract price for 65 days after completion. Before this time had arrived Sherman had defaulted on its obligation to make "prompt" payment to materialmen. Cf. Bridgeport Hardware Corp. v. Bouniol, 89 Conn. 254, 93 A. 674.

As a result, at no time since it furnished the labor and materials has Sherman been in a position to demand from McGraw the full payment stipulated in the subcontract; it was entitled to receive from McGraw only the contract price less the amount of its unpaid indebtedness to Blackburn and Milcor. Since the amount owed by Sherman to Blackburn and Milcor exceeded the balance due to Sherman on the contract price, Sherman had no "right of property" in the unpaid contract to which the Government's claimed lien could attach. And merely by assertion of a lien the rights of the Government rose "no higher than those of the taxpayer whose right to property is sought to be levied on." Karno-Smith Co. v. Maloney, 3 Cir., 112 F.2d 690, 692.

I hold, therefore, that the cross-complaint of the United States should be dismissed.

### Motions to Dismiss Complaint.

At the trial, both Milcor and Blackburn moved to dismiss the complaint on the ground that it fails to state a proper case for an action of interpleader. At the time I took a contrary view but upon the insistence of counsel reserved the point for consideration upon briefs. After full deliberation over the points thus raised, I still must rule that the motions should be denied.

McGraw's complaint, to be sure, is not expressly laid upon the bond: It makes no mention of the bond. It does, however, allege facts showing that it is exposed to the hazard of multiple claims under the subcontract with Sherman. Granted that materialmen have in law no direct right of action against McGraw *under the subcontract,* nevertheless they might make claim thereunder, notwithstanding. And here, as it happens, Blackburn (Findings, Par. 14) was indeed expressly making claim under the subcontract. Also the United States,—whose intervention relates back. And the several named defendants who have been defaulted must be deemed to have admitted that they, too, were making such claims.

Perhaps if Milcor had seasonably and unequivocally renounced all claim under the subcontract and had thereupon sought to be dropped as a defendant, its motion to that effect should have been granted. But it is quite another thing to ask at this late date for a dismissal of the complaint on the technical ground advanced. Cf. Federal Rules of Civil Procedure, rule 12(b), 28 U.S.C.A. following section 723c.

Moreover, Milcor and Blackburn by their counterclaims have brought the issues involved under the bond into the case. When

McGraw, as obligor under the bond, pays the judgment herein in favor of Milcor and Blackburn it will become subrogated to their rights against Sherman. Indeed, it is implicit in my ruling dismissing the claim of the United States that any claim of Sherman's against McGraw under the subcontract is subject to recoupment in the amount of Sherman's unpaid indebtedness to Milcor and Blackburn.

Altogether I am satisfied that McGraw was subject to multiple liabilities and that the case is within the scope of the Federal Interpleader Act, 28 U.S.C.A. § 41(26), as liberalized by Federal Rules of Civil Procedure, rule 22, even though in the outcome, Sherman having suffered a default, I find none of the defendants entitled to the specific fund in court. The fund, of course, by appropriate provisions in the decree, should be made available for the discharge, pro tanto, of McGraw's obligations to Milcor and Blackburn under the bond, as determined herein. Perhaps this can most conveniently be accomplished by a provision that McGraw, upon filing in court a satisfaction of the judgments in favor of Milcor and Blackburn, shall be entitled to a return of the fund.

Conclusions of Law.

1. On its counterclaim and complaint Milcor is entitled to judgment against McGraw and Aetna in the principal sum of $6,372.51.

2. All questions relating to the application by Blackburn of payments received from Sherman must be determined under the law of New York.

3. Under the law of New York, Blackburn made valid and effective applications of payments received from Sherman as a result of which Sherman's indebtedness to Blackburn on account of the Fairfield job remained unpaid in the amount of $9,009.64.

4. On its counterclaim and complaint, Blackburn is entitled to judgment against McGraw and Aetna in the principal sum of $9,009.64.

5. The claim of the United States should be dismissed on the merits.

6. The motions of Milcor and Blackburn to dismiss McGraw's complaint should be denied.

Counsel may submit a comprehensive draft judgment for entry, on a week's notice to opposing counsel, which may be set-

tled in chambers at New Haven on April 28th at 12 o'clock, noon, at which time also counsel may be heard on the issue of interest, if interest is claimed.