**TRANSMIX CONCRETE OF ROCK-
DALE, Plaintiff,**

v.

**UNITED STATES of America et al.,
Defendant.**

Civ. A. 1453.

United States District Court
W. D. Texas, Waco Division.

Feb. 15, 1956.

John J. McKay, Austin, Tex., for
Transmix Concrete of Rockdale, plaintiff.

Charles F. Herring, U. S. Atty., and
Lonnie F. Zwiener, Asst. U. S. Atty.,

Austin, Tex., for the United States, defendant.

Camp & Camp, Rockdale, Tex., for B. W. C. Const. Co., defendant.

RICE, District Judge.

From the pleadings of the parties, the stipulations filed herein, and the evidence introduced at the trial of the above cause on July 12, 1954, and in accordance with Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A., this Court makes and enters the following Findings of Fact and Conclusions of Law:

**1**

This is an action of a civil nature, arising under the laws of the United States, particularly the Revenue Acts, involving more than $3,000 and less than $10,000, and this Court has jurisdiction thereof.

**2**

The Court finds that each and all of the stipulations on file herein are true and correct, and the Court references the same, incorporating all of such stipulations herein as a part of the Findings of Fact.

**3**

Calhoun Development Company, a wholly owned subsidiary of Aluminum Company of America, as owner, contracted for the construction of a housing subdivision at Rockdale, in Milam County, Texas, in 1951, 1952 and 1953. Karl B. Wagner Engineering, Inc., was the general contractor, J. R. Canion was the first-tier subcontractor under Wagner, W. S. Conner was a subcontractor under Canion to construct curbs and gutters, and B. W. C. Construction Company (an assumed name used by J. L. Wayte, W. G. Braddock and J. L. Colwell, a partnership) was a subcontractor under Conner to construct the curbs and gutters.

**4**

B. W. C. Construction Company contracted with Conner to furnish the necessary labor and materials to complete certain specified concrete curb and gutter work. The agreed consideration between them was fixed on a lineal foot basis.

**5**

At all times pertinent to this case, J. R. Canion has owed W. S. Conner $7,049.59 arising out of their contract with each other, which amount is in the registry of the court as all that remains of the original construction contract with Aluminum Company of America.

**6**

At all times pertinent to this case W. S. Conner has owed B. W. C. Construction Company Seven Thousand Forty-Nine and 59/100 Dollars ($7,049.59), which amount is in the registry of the court and is all that remains of the original construction contract with Aluminum Company of America.

**7**

Transmix Concrete of Rockdale, during the period August–October, 1952, furnished ready-mixed concrete, as ordered by B. W. C. Construction Company, which the latter used in constructing the curbs and gutters. The total amount furnished, in proper quality, at prices just and reasonable, was in the value of $11,496.45. This concrete was used and incorporated in the curb and gutter improvements on said project. The concrete was furnished on an open account, Conner making total payments in September and October, 1952, to plaintiff of $6,252.40, in accordance with his agreement with, and the instructions and consent of B. W. C., and at the end of the job there was owing to Transmix Concrete of Rockdale the sum of $5,246.05, which has not been paid. The Transmix delivery tickets were made in the name of B. W. C. From November 1st, 1952, and thereafter, Transmix billed the balance due to B. W. C. Construction Company and to W. S. Conner.

**8**

B. W. C. gave its permission to Conner before September 15, 1952, to make payment of money to Transmix out of funds Conner owed to B. W. C. to be applied

on B. W. C.'s indebtedness; also B. W. C. gave Canion permission through Conner to make payments directly to Transmix on B. W. C.'s indebtedness to Transmix out of funds which Conner owed to B. W. C. and which Canion owed to Conner.

9

W. S. Conner made two payments to Transmix Concrete of Rockdale for concrete furnished on the B. W. C. Construction Company subcontract.

10

The concrete for which Transmix Concrete of Rockdale is seeking payment was furnished to B. W. C. Construction Company, and any payments made to Transmix Concrete of Rockdale by W. S. Conner for concrete furnished to B. W. C. Construction Company were made with the consent of B. W. C. Construction Company, and such amounts were credited on the agreed contract price owed by Conner to B. W. C. Construction Company under their subcontract.

11

At all times pertinent to this case, J. L. Wayte, W. G. Braddock and J. L. Colwell, doing business as B. W. C. Construction Company owed the United States of America the amounts set out in the stipulation of facts on file, Government Exhibit No. 1 on file in the papers of this cause, and the answer of the United States on file herein, and the notices of tax liens were filed on the dates and in the manner set out in said Government Exhibit 1, said stipulation and said answer.

12

Transmix Concrete of Rockdale furnished its first material to B. W. C. Construction Company on August 26, 1952, and the first taxes described above accrued in the Second Quarter of 1952, and became a debt due and owing to the United States of America as of June 30, 1952.

13

The claim of Transmix Concrete of Rockdale, in the amount of $5,246.05, is based on an open account, and is that of a materialman for material furnished and used in the project as described. This materialman filed a statutory materialman's lien, but same was not filed within 90 or within 120 days after furnishing the last material, or after the indebtedness accrued.

14

(a) Transmix Concrete of Rockdale was not a subcontractor and had no agreement with the "owner", either written or oral. However, the contract of the owner with the general contractor, and of the general contractor with J. R. Canion, contained this written provision, as a part of Article 17 of the General Conditions as follows:

"C. Payments otherwise due may be withheld by the Owner on account of defective work not remedied, claims filed, or reasonable evidence indicating probable filing of claims, failure of the Contractor to make payments properly to subcontractors, or for material or labor, or a reasonable doubt that the contract can be completed for the balance then unpaid, or on account of the failure of the Contractor to perform any of his other obligations under this contract. If the foregoing causes are removed the withheld payments will promptly be made. If the said causes are not removed on written notice, the Owner may rectify the same at the Contractor's expense."

(b) Similarly, the contract between J. R. Canion and W. S. Conner was one for the furnishing by the latter of all labor and materials in connection with the curb and gutter work.

(c) The original agreement between W. S. Conner and B. W. C. was one for the furnishing by the latter of all work and material for the curbs and gutters; however, this was amended prior to delivery of material by Conner's agreement to pay for the ready-mix concrete and take credit therefor as against B. W. C., which arrangement for payment Transmix was familiar with and agreed to.

**15**

The existence and amount of the unpaid claim of Transmix Concrete of Rockdale for materials furnished by it on this project was known by all the contracting parties at a time when the retainage fund in the hands of the owner for payment to the contracting tier was well in excess of the amount of the Transmix claim.

**16**

Just prior to or at about the time Transmix commenced furnishing concrete, W. S. Conner represented to Transmix officials that he would see that the charges for this material were paid, which representations, made for a valuable consideration, were accepted and relied on by Transmix. Following this, Conner made two payments.

**17**

At a time when Transmix was still furnishing material to the job, and before the last percentage of completion estimate was due, and before Transmix had been fully paid, or its account had become delinquent, and while the owner had in its possession funds for payment of the balance of the general contract (including the retainage fund), and before the filing of any tax liens, Conner, acting with the knowledge of B. W. C., represented to Transmix that Transmix was authorized to receive payment for its material from the first-tier subcontractor, J. R. Canion, and Conner, acting with the prior knowledge and consent of J. L. Wayte, a partner of B. W. C., and at Wayte's request, notified J. R. Canion that he was to make payment to Transmix for its material bill out of funds coming to the said Canion. Both Canion and Transmix assented to this arrangement, Canion obligating himself that before Conner received any more moneys from his portion of the contract that he, Canion, would pay Transmix for its material furnished on the job. This arrangement was confirmed by Transmix letter of January 19, 1953.

**18**

At no time did B. W. C. retract its agreement that Conner would pay Transmix for its material furnished, nor did B. W. C. or Conner retract the subsequent agreement that Transmix would be paid out of contract funds coming to the first-tier subcontractor, Canion.

**19**

Transmix Concrete of Rockdale, acting through its president and secretary, believed, relied and acted upon the representations, arrangement and agreement that Transmix would be paid for its material out of funds coming into the hands of the first-tier subcontractor, Canion, and accordingly looked to the fund in Canion's hands.

**20**

Because of the fact that the material claim of Transmix has not been paid, neither the general contract nor the several subcontracts for curb and gutter work have been fully and completely performed, and the sums owing by virtue of the general contract and the successive subcontracts are owed subject to performance of this obligation to pay such material claim.

**21**

The fund out of which Transmix was to be paid was the specific construction fund created by the owner to discharge the contract obligations, was provided for at the time Transmix undertook to furnish and did furnish its material, and at all subsequent times remained in existence, the balance thereof being the retainage fund, and the sum paid into the registry of the Court by the owner.

**22**

The arrangements for payment of the claim of Transmix were made for valuable considerations moving between the parties, were relied upon by Transmix, who acted in good faith in furnishing its material and looking to the construction or contract fund for payment.

Opinion and Conclusions of Law

1

Transmix Concrete of Rockdale, as a materialman, brought this suit seeking payment of its material bill for $5,246.-05 out of the retainage portion of a construction fund in the hands of the owner, Aluminum Company of America. Among others, plaintiff impleaded the Government, alleging that it asserted a lien against the fund by virtue of taxes due by a subcontractor, B. W. C. Construction Company. The Government based its claim of a lien on 26 U.S.C.A. § 6321 (formerly 26 U.S.C.A. § 3670), and related provisions, which affords a lien in its favor "upon all property and rights to property" belonging to the delinquent taxpayer. The lien was filed in connection with Withholding and Federal Insurance Compensation Act Taxes.

2

The retainage fund was paid into the registry of the Court by the owner, and it is undisputed that all parties recognize the Transmix claim for material to be just, due and unpaid. The contracting tier was as follows: Karl B. Wagner Engineering, Inc., general contractor; J. R. Canion, first-tier subcontractor; W. S. Conner, second-tier subcontractor; B. W. C. Constr. Co., third-tier subcontractor; Transmix, the unpaid materialman.

3

The position of Transmix is that it was approached by, and arrangements for its material were made by Conner, who was to pay out of the fund as it came to his hands; that further, during the course of delivery of material, B. W. C. and Conner agreed and represented to Transmix that it would be paid out of funds coming to Canion, which arrangement was accepted and relied upon by it, and never retracted by any member of the contracting tier. While B. W. C. sought application of the entire fund to its tax debt, it is to be noted that it pleaded affirmatively that it had no dealings with Transmix, and that Conner was to furnish the ready-mix concrete and take credit on paying therefor at the discount rate. Conner admitted that about the time of delivery of material commenced he had an agreement by which he could pay the Transmix bill for material, and did thereafter make two payments thereon. The evidence fully sustains these contentions of plaintiff.

4

It is apparent, and the Government admits, that it can have no lien except upon the "property" of the taxpayer. It claims a lien upon the entire fund, but does not and cannot dispute the fact that the materialman's claim stands unpaid. In short, it is the Government's view that it was the obligation of B. W. C. to furnish the labor and material for its subcontract, and that the claim of Transmix is solely one against B. W. C., nonpayment of which by the latter does not affect B. W. C.'s ownership of the fund as its "property", hence the Government's lien is enforceable against the entire fund.

5

■ The rights of the Government can rise no higher than those of the taxpayer. "The lien does not, however, extend to the property of anyone other than the person liable for the tax." 174 A.L. R. 1373, 1379, and decisions there cited.

6

■ Ignoring, for the moment, the supplemental agreements made between the parties, if it was the original obligation of B. W. C. to furnish and pay for the material in question, then, both under the evidence in this case and the applicable law, it was the right of the owner, and each contractor in the tier, to withhold from B. W. C. that sum necessary to satisfy the unpaid material claim. Not only did the general contract and all contracts down to the B. W. C. level so provide, but further, such seems to be the accepted custom. The fund in the hands of the owner was subject to the rule that "if the contract gives him the right to retain sufficient to indemnify him against claims and liens, upon proof of the existence thereof, the owner need not pay any

balance due the contractor until he is completely indemnified against such claims and liens." 17 C.J.S., Contracts, § 368, p. 835.

7

Even as an original proposition, if, (as the Government contends) it remained the obligation of B. W. C. to furnish and pay for the necessary labor and material to perform his contractual obligation, it cannot be said that he performed that obligation in light of the unpaid material claim. A similar case is that of McGraw & Co., Inc., v. Sherman Plastering Co., Inc., D.C.Conn., 60 F.Supp. 504, affirmed F. H. McGraw & Co. v. Milcor Steel Co., 2 Cir., 149 F.2d 301, certiorari denied F. H. McGraw & Co. v. John T. D. Blackburn, 326 U.S. 753, 66 S.Ct. 92, 90 L.Ed. 452, where the Government also asserted a lien against a subcontractor who had defaulted and failed to pay a materialman. In holding that the fund was not the "property" of the taxpayer, the court said, 60 F.Supp. at page 511, 512:

"And just as McGraw, under the principal contract, was obligated for the prompt payment of materialmen generally, so Sherman under its subcontract with McGraw was obligated to make prompt payment to its materialmen.

"And even if it were impossible to spell out in the subcontract an express obligation whereby Sherman was to pay its own materialmen, from the surrounding circumstances such an obligation must needs be implied. In the light of prevailing business practice, it would be preposterous to infer a mutual intent that McGraw should obligate itself to pay Sherman $80,000 for labor and material not paid for. A contrary intent is clearly to be inferred. * * *

"We have, therefore, this situation: Under the subcontract, in exchange for a performance on the part of McGraw taking the form of stipulated payments, McGraw was entitled to a two-fold performance on the part of Sherman, viz., (1) the furnishing of the stipulated labor and material and (2) the prompt payment by Sherman for the stipulated labor and material. Assuming, and it is not disputed, that Sherman furnished the labor and material, nevertheless at least to the extent that Sherman failed to pay Blackburn and Milcor there has been a failure of consideration on the part of Sherman under the subcontract. And this failure of consideration at all times has been available to McGraw as a defense pro tanto, or by way of recoupment, to any claim which Sherman might make against McGraw on the subcontract. Williston on Contracts, 2nd Ed., Par. 813, et seq., 883; Restatement of Contracts, Sec. 274; Tice v. Moore, 82 Conn. 244, 73 A. 133, 17 Ann. Cas. 113.

"The case is also within the rule of Sec. 270 of the Restatement. For under the contract McGraw was privileged to withhold 10% ($8,000) of the contract price for 65 days after completion. Before this time had arrived Sherman had defaulted on its obligation to make "prompt" payment to materialmen. Cf. Bridgeport Hardware Mfg. Corp. v. Bouniol, 89 Conn. 254, 93 A. 674.

"As a result, at no time since it furnished the labor and materials has Sherman been in a position to demand from McGraw the full payment stipulated in the subcontract; it was entitled to receive from McGraw only the contract price less the amount of its unpaid indebtedness to Blackburn and Milcor. Since the amount owed by Sherman to Blackburn and Milcor exceeded the balance due to Sherman on the contract price, Sherman had no 'right of property' in the unpaid contract to which the Government's lien could attach. And merely by assertion of a lien the rights of the Government rose 'no higher than those of the taxpayer whose right to property is sought to be levied on.' * * * * "

The foregoing decision has been cited with approval in United States v. Yates, Tex.Civ.App., 204 S.W.2d 399, 406, writ ref. n. r. e.

█ If, therefore, as the Government claims, the materialman, Transmix, was relegated solely to B. W. C. for payment of its material claim, this, in itself, would

not constitute the fund the "property" of B. W. C., for at all material times both the owner and the higher tier contractors had the right to withhold the full amount necessary to pay the material claim. Any other rule would seem to encourage a breach of just contracted obligations, and allow a taxpayer to apply the property of others to his own tax debts.

The case of Karno-Smith Co. v. Maloney, 3 Cir., 112 F.2d 690 is also similar. There the subcontractor owed the Government taxes, had also failed to pay his materialmen; the Government made demand upon the general contractor to pay over funds held by it; the general contractor made payment under protest, and sued to recover the payment thus made. In directing the Government to refund the money so paid, the court said, 112 F. 2d at page 692:

"We think the equities of the case are clearly with the plaintiff. It finds itself in a dilemma forced upon it by the law. Under its contract it is obligated to its subcontractor and under its bond it must pay the latter's unpaid debt to its materialman. The two obligations arise out of the same transaction, but payment of the subcontractor's taxes pursuant to the collector's levy and demand will not and cannot discharge the obligation to the subcontractor's materialman * * *. Under these circumstances it would be manifestly inequitable to enforce both obligations. United States v. Bank of Shelby, 5 Cir., 68 F.2d 538. We think it clear that in a case of this kind the rights of the collector rise no higher than those of the taxpayer whose right to property is sought to be levied on. * * * "

It may be said that the same equities exist in this controversy, for an award of the fund to application of the subcontractor's taxes would force a breach of each of the several contracts to the extent that same required labor and materials to be furnished and paid for. There could be no justification for forcing a breach of the general contractor's bond in this fashion and requiring a materialman to exert that right against the surety which he would apparently have. 9 Am.Jur. § 95, p. 61; 77 A.L.R. p. 53.

Therefore, to the extent of the unpaid material claim of Transmix, the fund held in the registry of the Court is not the "property" or "rights to property" of B. W. C. If it was the obligation of B. W. C. to pay for the material, the fact remains that it did not do so, and it cannot stand in default upon its obligation and at the same time obtain payment therefor. Accordingly, upon this theory of the case, the Government's lien cannot operate against that portion of the fund which is not owned by the taxpayer as its property.

8

At about the time that Transmix commenced delivery of its material to the job site, Conner undertook the payment of the material bill, and made two payments thereon. Sometime later, but while material was still in process of delivery, and Transmix was owed a considerable sum, it was represented to Transmix that it would be paid out of the fund as it came into the hands of the first-tier subcontractor, J. R. Canion. Transmix relied upon this representation, accepted the obligation undertaken by Canion made with consent of both Conner and B. W. C., and in consideration thereof, continued to make delivery of material. This understanding was later confirmed in writing by a Transmix letter. This arrangement (at no time retracted) was made several months before the Government filed its lien. When the Government's lien was filed this action resulted in a stoppage of any further payment by the owner, who thereafter paid the balance of the fund into the Court's registry.

■ In view of these facts it is the opinion of the Court that Transmix acquired an equitable lien, or assignment, as to the fund, which the various contracting parties, including B. W. C., are estopped to deny. Such liens are recognized in this State. In re Estes, D.C. Tex., 105 F.Supp. 761. Furthermore, they are not within the requirements of

the recording statutes. 36 Tex.Jur. § 25, p. 429.

This agreement was entered into upon good consideration at a time when Transmix was still delivering its material, and before the account therefor had become delinquent, and before the 90-day period for filing statutory materialman's liens had expired.

■ Such an equitable lien upon personalty—as was the fund in question—need not be in writing. 28 Tex.Jur., § 7, p. 11; Pomeroy, Equity Juris. § 1235, p. 2862. The fund was a specific one, and there is no doubt that both B. W. C. and Conner agreed that Transmix was to be paid from that fund as it came into the hands of the higher tier subcontractor, J. R. Canion.

■ Both the general contract and first-tier subcontract contain provisions appearing to dedicate "the final retainage payment as a fund for the satisfaction of claims for labor and materials, and fixes an equitable lien thereon in favor of the materialmen and the surety, before any part of said final retainage belongs to the contractor." Standard Accident Ins. Co. v. Huddleston, D.C.Tenn., 51 F.Supp. 645, 651. In fact, it is a recognized rule that such retainage funds are not subject to garnishment until the contract is fully performed. See 82 A.L.R. 1115, 1119. It is to be kept in mind that the Transmix material was used to bring the fund into existence. Compare Mitchell v. Bowman, 10 Cir., 123 F.2d 445.

Where the contractor gave the materialman an order on the owner for purposes of paying the material claim, an equitable lien upon the fund was recognized in Wood v. Amarillo Imp. Co., 88 Tex. 505, 31 S.W. 503, 505:

"The circumstances show that it was the intention of the parties that the note was to be paid out of the fund; and we think it is also apparent that it was contemplated that the draft should be paid from the same source. This, it would seem, would make an equitable assignment of so much of the fund, and would authorize the court, in the adjustment of the equities between the parties, to decree that the plaintiff company should pay from the money found due to Wood & Tunnell the amount which the latter had directed it to pay."

■ The applicable principles are stated in 28 Tex.Jur., § 6 et seq., pp. 10–15. Even though it be argued that the "fund" was not in full existence at the time of the agreement that Transmix was to be paid therefrom by Canion, "such provision for property to be acquired in the future becoming security for advances to be made upon such acquisition occurring is effective to give rise, at the time of the acquisition of the property by the party who obtains advances thereon, to an equitable charge or lien thereon in favor of the maker of the advances provided for. [Cases cited.]" First Nat. Bank of Chicago v. Southwestern Lumber Co., 5 Cir., 75 F.2d 814, 817.

In a similar case, when it was agreed that the materialman furnishing materials to the contractor would be paid directly by the owner, such agreement was declared sufficient to establish an equitable lien upon the fund in Johnson v. Root Mfg. Co., 241 U.S. 160, 36 S.Ct. 520, 521, 60 L.Ed. 934, 936:

"We are of opinion that there is no reasonable doubt that all parties were justified in the course adopted, that the instrument of January 12 created an equitable lien in favor of all alleged liens which the parties should deem to have color of right, and that the fund being thus appropriated and set aside, it does not matter that the formal ascertainment of the specific beneficiary was made within four months of bankruptcy proceedings. It was well understood before. The Root Company took part in the preliminary discussions, and there can be no doubt that it was expected by all on January 12 that its claim, however disputed, would have to be dealt with when the fund came to be paid out."

Upon this point, see also Beilharz v. Illingsworth, 62 Tex.Civ.App. 647, 132 S. W. 106, writ ref.; Theatre Realty Co. v.

Aronberg-Fried Co., Inc., 8 Cir., 85 F.2d 383; 53 C.J.S., Liens, § 4, Equitable Liens, p. 836. B. W. C. should not be unjustly enriched by appropriation of the construction fund to payment of its taxes at the expense of an unpaid materialman. The language in Texas Co. v. Miller, 5 Cir., 165 F.2d 111, 114, seems appropriate:

"Such a transaction in effect would be the taking of the seller's money and indirectly, but effectively and gratuitously, handing it over to the seller's customer. Equity does not look with favor on the unjust enrichment of one person at the expense of another and will generally exercise its offices either by applying the principle of subrogation or by declaring the existence of a constructive trust or of an equitable lien in prevention thereof."

The rights of Transmix as against the fund by virtue of the equitable assignment arose in early October, 1952; the Government's first lien was not filed until January 21, 1953. The fund had been pledged to Transmix several months prior to that time, in addition, upon the authorities above cited, B. W. C. had no property in the fund to the extent of the unpaid material claim. 26 U.S.C.A. § 6323; In re Van Winkle, D.C.Ky., 49 F. Supp. 711; Great American Indemnity Co. v. United States, D.C.La., 120 F. Supp. 445, 451; McGraw & Co. v. Sherman Plastering Co., supra; New York Cas. Co. v. Zwerner, D.C.Ill., 58 F.Supp. 473; United States Fidelity & Guaranty Co. v. United States, 10 Cir., 201 F.2d 118, 121.

### Summarized Conclusions of Law

(1) Under the facts and applicable law, plaintiff, Transmix Concrete of Rockdale is entitled to the relief prayed for in its amended complaint.

(2) The fund of $7,049.59 now in the registry of the Court is not the property of the taxpayer, B. W. C. Construction Company, nor does it have any right to property therein, to the extent of the sum of $5,246.05, the portion thereof rightfully belonging to plaintiff, Transmix Concrete of Rockdale.

(3) The United States of America does not have a lien against that portion of the fund in the registry of the Court which belongs to plaintiff, Transmix.

(4) Plaintiff, Transmix, is entitled to judgment against all parties directing the Clerk of the Court to pay over to it the full amount of that portion of the fund belonging to it, and all costs of suit should be taxed against the balance remaining.

(5) The balance remaining in the registry of the Court after payment of plaintiff, and payment of all costs of suit is the property of defendant, B. W. C., and as such, is subject to foreclosure of the Government tax liens thereon, and judgment providing that the Clerk of the Court pay such balance over to Ellis Campbell, Jr., Director of Internal Revenue, Dallas, Texas, to be applied upon the tax indebtedness of the taxpayer, B. W. C.

For all of which judgment herein will provide.