TANENBAUM TEXTILE CO., INC., PLAINTIFF-RESPONDENT, v. VOGUE FOUNDATIONS, INC., A CORPORATION, AND HERMAN GOLDEN, DEFENDANTS, v. THE UNITED STATES OF AMERICA, INTERVENOR-APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued July 25, 1955—Decided September 2, 1955.

Before Judges FRANCIS, HALL and BURTON.

*Mr. Samuel A. Larner* argued the cause for the respondent (*Messrs. Budd, Larner & Kent,* attorneys).

*Mr. James C. Pilney,* Assistant United States Attorney, argued the cause for the appellant (*Mr. Raymond Del Tufo, Jr.,* United States Attorney, attorney).

The opinion of the court was delivered by

FRANCIS, J. A. D.   Plaintiff Tanenbaum Textile Co., Inc., brought this action in replevin to obtain possession of a check dated November 13, 1952, in the amount of $6,284.25 drawn on the Treasurer of the United States by the New York Quartermaster Procurement Agency to the order of

defendant Vogue Foundations, Inc. The check had been endorsed in blank by Vogue and was in the hands of its attorney, the defendant Herman Golden, Esq. Pursuant to the writ the sheriff seized the instrument and delivered it to Tanenbaum which posted a bond to secure payment in accordance with the judgment of the court.

The United States of America intervened through the District Director of Internal Revenue, claiming the proceeds by virtue of certain tax liens against Vogue. Golden asserted rights in the check by reason of an alleged attorney's lien for services rendered to Vogue. Vogue counterclaimed but its answer and counterclaim in the replevin action are not included in the appendix and consequently the nature of the claim does not appear. The pretrial order reserved the counterclaim for disposition by jury trial at a later time. In answer to the intervention, Vogue admitted the existence of tax liens in an amount in excess of the check and also that as to it the United States had a prior right to the sum represented thereby. The admission could not have been avoided since prior to November 13, 1952 unpaid taxes withheld by Vogue totaling $13,193.48 had appeared on the assessment list received by the District Director, and thus constituted liens. 26 *U. S. C. A.* § 3671 (1940). In fact, $11,478.69 of these liens had been recorded with the Register of Essex County prior to the assignment and the agreements hereafter referred to.

After hearing without a jury, the trial court determined that Tanenbaum was entitled to the check and the proceeds thereof and that its right was paramount to the tax lien. Golden was declared to have no interest therein. Judgment was entered for Tanenbaum against all defendants. The United States filed this appeal.

██ Absence of disposition of the Vogue counterclaim raised a serious question as to whether an appealable final judgment existed. The right of appeal arises only when a controversy presented to the trial court is adjudicated as to all parties and all issues (*Peterson v. Falzarano,* 6 *N. J.* 447, 453 (1951); *Vollbehr v. Ingram,* 22 *N. J. Super.* 249 (*App.*

*Div.* 1952))), subject to the qualification established by *R. R.* 4:55–2, which was not taken advantage of here. However, our inquiry at the oral argument elicited the undisputed information that the counterclaim has since been withdrawn. On this agreement we shall deal with the issues presented.

Recital of the facts is necessary to an understanding of the claims of the parties.

On December 6, 1951 the New York Quartermaster Procurement Agency awarded a contract to Vogue for the manufacture of 250,000 waterproof clothing bags at a price of $1.05 per bag. Delivery was to be made between March 31 and June 30, 1952. Apparently in anticipation thereof, Tanenbaum contracted to furnish the material necessary to the making of the bags, namely, 254,500 yards at $.7538 per yard. The terms called for payment ten days after delivery of each shipment.

Between February and April 1952 Tanenbaum delivered in excess of 21,000 yards of the cloth. On April 15 Vogue was advised that its credit line was exhausted and unless satisfactory arrangements were made, further shipments would be on a cash basis only.

As the result, on April 25, 1952 a letter agreement was entered into under which Tanenbaum undertook to advance $1,500 to Vogue to enable it to meet current payroll expenses, and further to deliver the balance of the yardage to complete the commitment to the government. To assure payment, Vogue agreed to establish a special account in a bank to be selected by Tanenbaum and to deposit therein all moneys received from the United States for performance of the clothing bag contract, subject to withdrawal only on the signature of an officer of Tanenbaum.

Tanenbaum was further authorized thereby to draw on the account for reimbursement of the $1,500 and to the extent of $.76 per bag shipped to the government. Any remaining balance was to be turned over to Vogue. The account was to continue until all goods sent to Vogue were paid for.

It was agreed also that Vogue would execute any documents necessary "to effectively assign to a financial institu-

tion to be designated by" Tanenbaum, "all of our right, title and interest" in the government contract to secure all monies due or to become due to Tanenbaum. The record shows that the bank account was opened. An assignment to the Bank of Manhattan Company, dated June 24, 1952, was put in evidence. The late date was not explained.

In July, when only 26,500 bags had been delivered, Vogue experienced further and apparently insurmountable obstacles in its attempt to fulfill the government contract. On July 17, 1952 the Procurement Agency was advised that an "impasse" had been reached "due to factors entirely beyond our control." The letter asserted that the lessor of the premises leased by Vogue for its manufacturing purposes had discovered that the process used in cementing the bags was contrary to the terms of the lease and had refused permission for the work to continue. Efforts to locate other quarters had been unsuccessful.

On account of its inability to proceed further, Vogue requested permission to "subcontract the balance" of the contract to Electro-Plastics Fabrics, Inc., of Pulaski, Va. It proposed to do this at "no profit" and in order to expedite delinquent deliveries.

No additional cost was to be involved for the government and if any such cost arose, Vogue would absorb it. The letter pointed out that the cloth necessary for the remaining bags was being held by Tanenbaum which had agreed to deliver it to Electro.

Vogue said also that to safeguard the interests of Tanenbaum and Electro, an assignment "of all the proceeds due and to become due" under the contract would be executed to the Bank of Manhattan Company (emphasis ours). This would be done upon the granting of the permission sought from Procurement. Tanenbaum endorsed its consent to the proposal at the foot of the letter and noted an additional agreement to guarantee performance by Electro.

On August 13 the Procurement Agency granted permission to subcontract the manufacture of the balance of 223,500 bags to Electro on condition that any increased costs

would be borne by Vogue and any savings would inure to the government.

Upon receipt of this approval a further tripartite agreement was entered into by Vogue, Tanenbaum and Electro on August 20. By it, Vogue agreed to deliver to Electro 1,250 bags which had been completed and 10,150 which had been partly completed. The finished bags were to be shipped by Vogue to Electro at no cost to Tanenbaum. Electro undertook to finish the partly completed bags at $.15 each. All others were to be manufactured at $.32 per bag exclusive of the cost of material, an increase of $.03 over Vogue's price. This differential was absorbed by Tanenbaum, apparently being reflected in the lower cost of the cloth to Electro.

The compact recited that Electro would be paid out of the proceeds of the contract which were "in the course of being assigned" by Vogue to the Bank of Manhattan Company. And each company stipulated that to the extent necessary to accomplish proper payment of their respective shares, instructions would be given to the bank.

A receipt introduced in evidence shows that Vogue shipped the materials on hand to Electro on August 21. Thereafter Electro took over. Vogue did no further work on the government contract and about a month later ceased business operations entirely.

The only assignment offered in evidence was the one already mentioned, dated June 24, 1952. Apparently no additional one was executed after Electro was granted permission to complete the contract. Presumably it was considered unnecessary but the absence of explanation or testimony to that effect leaves the relation between this assignment and the June and August agreements in a somewhat unclear state. However the contents of the document must be noted. The recital is that Vogue has requested the bank to lend money to finance its operations under the government contract, and because the bank "may from time to time" lend money for such purpose "all moneys due or to become due" to Vogue under the contract are assigned to the bank as collateral for the loans.

This assignment does not seem to conform with the language of the three-party agreement of August 20 nor the letter to the Procurement Agency of July 17 seeking permission for Electro to furnish the balance of the clothing bags. There is some ambiguous testimony in the record about a $5,000 loan by the bank to Vogue and the payment of the loan by a check of Tanenbaum of August 12. No proof was offered as to any borrowing from the bank after Electro entered upon the performance of Vogue's contract.

One inference to be drawn from this situation is that an effort was being made to create an assignment which would appear to run to a "bank, trust company or other financing institution" within 31 *U. S. C. A.* § 203 (1954); 41 *U. S. C. A.* § 15 (1952); (see legislative history. 2 *U. S. Code Congressional and Administrative Service* 1951 *p.* 1414 *et seq.*), and which upon filing with the Procurement Agency would result in the naming of the bank as payee in the future checks and possibly in precluding a set-off of the assignor's unpaid taxes pursuant to the statute. But it was not filed with the Agency as required by subsection 4 of section 203, *supra,* until after the check in question was drawn to Vogue. In any event, the statute was designed for the protection of the government against multiple claims and although an assignment which did not meet the conditions imposed by Congress might be void or unenforceable against the United States, such status would not bar its legal efficacy between the parties. *McKenzie v. Irving Trust Co.,* 323 *U. S.* 365, 65 *S. Ct.* 405, 89 *L. Ed.* 305 (1944); *Bank of California v. Commissioner,* 133 *F. 2d* 428 (*9th Cir.* 1943); *California Bank v. U. S. Fidelity & Guaranty Co.,* 129 *F. 2d* 751 (*9th Cir.* 1942).

Plaintiff's complaint predicated the right to possession of the check upon the April 25, 1952 agreement, under which, as already noted, Vogue agreed to execute all documents necessary "to effectively assign to a financial institution to be designated" its interest in the contract and the proceeds thereof as security for moneys advanced or to be

advanced by Tanenbaum. No reference is made to the specific assignment of June 24 but it is the only one proved at the trial.

The subcontract by Vogue is recited somewhat incidentally without mentioning Electro or its interest resulting therefrom and without a statement of facts showing any rights which flowed to Tanenbaum as a consequence.

Thus the theory of the action as established by the pleading was that by reason of the agreement of April 25, 1952, the assignment of the contract and the proceeds thereof and the establishment of the special bank account into which the payments from the government were to be deposited, Tanenbaum was entitled to the $6,284.25 check. The pretrial order cannot be said to have made any change in the issues to be tried.

At the trial, plaintiff proceeded on the theory that under the agreement of July 17, 1952 between Vogue and Tanenbaum, and the tripartite concord of Vogue, Tanenbaum and Electro of August 20, following the granting of permission by the Procurement Agency to subcontract to Electro, Electro was substituted as the contractor and Vogue had no further interest in any of the proceeds of the contract. It seems to have been urged in the trial court, as it was before us at the oral argument, that Tanenbaum's right to the check was established by these agreements. The previous contract of April 25 and the assignment to the bank were claimed to be mere surplusage and of no legal consequence.

The United States objected to the introduction of the new theory of substitution of Electro for Vogue (in effect) as the prime contractor to complete the contract; it objected also to the receipt in evidence of the correspondence and the agreements relating thereto, contending that the issue pleaded arose out of the April 25 agreement. The objection was overruled.

In the absence of any amendment to the complaint or change in the alleged cause of action by means of the pretrial order, the government was entitled to assume that the trial would proceed on the issue as originally presented.

Counsel for the government concedes that he had copies of the various documents relating to the subcontract to Vogue and the assignment to the bank, and that he was generally familiar with the situation because of a review of the correspondence file of the Procurement Agency. However, he claims unpreparedness to meet the new issue and says that its projection into the proceedings at the trial prevented him from taking advantage of the discovery rules to ascertain the full rights of Vogue, Tanenbaum and Electro in the proceeds of the contract after Electro's appearance in the matter.

The issues plaintiff expected to try could have been put beyond doubt at the pretrial conference. But it was not done and we think for reasons to be stated that there is sufficient merit in the government's position to require reversal and retrial after adequate specification of the issues in the pleadings or pretrial order. *Schlossberg v. Jersey City Sewerage Authority*, 15 *N. J.* 360, 369–370 (1954).

Under 26 *U. S. C. A.* § 3670 (1940), whenever a person neglects or refuses to pay any tax after demand, the amount due constitutes a lien in favor of the United States "upon all property and rights to property, whether real or personal, belonging to such person."

In these times when employers are withholding sums of money from wages for the purpose of paying the employees' income tax, the public interest requires liberal interpretation and application of the lien statute because such money is the life blood of government. Thus it has been declared that the lien attaches to after-acquired property (*Glass City Bank v. U. S.*, 326 *U. S.* 265, 66 *S. Ct.* 108, 90 *L. Ed.* 56 (1945); 26 *U. S. C. A.* § 3671 (1940)), and extends not only to physical things but intangible rights and credits as well. *Citizens State Bank v. Vidal*, 114 *F. 2d* 380, 382 (*10th Cir.* 1940); 30 *Am. Jur., Int. Rev.* § 77.

The crucial word in the section of the statute is "belonging." The tangible or intangible property must belong to the taxpayer in order to be liable to the lien. The rights of the government can rise no higher than those of the tax-

payer; if he has no interest in the property sought to be executed against the lien is ineffective. *U. S. v. Burgo,* 175 *F. 2d* 196 (*3d Cir.* 1949); *U. S. v. Winnett,* 165 *F. 2d* 149 (*9th Cir.* 1947); *McGraw & Co. v. Sherman Plastering Co.,* 60 *F. Supp.* 504 (*D. C. Conn.* 1943), affirmed *F. H. McGraw & Co. v. Milcor Steel Co.,* 149 *F. 2d* 301 (*2d Cir.* 1945); *Karno-Smith Co. v. Maloney,* 112 *F. 2d* 690 (*3d Cir.* 1940); *U. S. v. Long Island Drug Co.,* 115 *F. 2d* 983 (*2d Cir.* 1940); *Bankers Title and Abstract Co. v. Ferber Co.,* 15 *N. J.* 433 (1954).

In this case, Tanenbaum contends that by virtue of the substitution of Electro for Vogue in the Procurement Agency contract, Vogue had no interest in any proceeds which subsequently flowed therefrom. The suggestion is that even though Electro was called a subcontractor, the effect of the writings between the parties and the government from a pragmatic standpoint was to make Electro the prime contractor, in fact, and Vogue simply a guarantor against loss to Procurement. *Cf. Thompson v. Commissioner,* 205 *F. 2d* 73, 77 (*3d Cir.* 1953). And finally it asserts that when the check was issued, Vogue was simply a trustee or holder or nominal payee without beneficial interest therein.

In our judgment, the government may well have been at a disadvantage in being forced to meet this precise issue on a complaint and pretrial order which, to say the least, did not adequately disclose it, and without the advantage of pretrial discovery with respect to it.

In this connection, reference may be made to some matters which the government indicated it would have looked into in advance of trial had the problem presented to the trial court been properly pleaded.

Under the August 20 agreement of Vogue, Tanenbaum and Electro, Vogue delivered 1,250 completed bags, 10,150 partially completed bags, and a number of rolls of material to Electro. Title to these goods was in Vogue. They could have been subjected to the tax lien. In any event, the 1,250 bags were worth $1.05 each or $1,312.50 on delivery to

Procurement; the 10,150 partially completed ones were to be finished by Electro for $.15 each—indicating $.90 each of value produced by Vogue—or $9,135. It is undisputed that the shipment to Procurement for which the $6,284.25 check was issued was made up partly from these finished bags and the remainder from the unfinished ones which were completed by Electro. Was Vogue to receive no compensation or credit for this total work product value of $10,447.50 when Electro made that delivery? The agreements are silent on the subject.

Counsel for Tanenbaum put a question to one of its officials as to whether Vogue received any consideration for the subcontract to Electro. On Vogue's objection, the inquiry was withdrawn "for the moment" but it was never pursued again. The president of Vogue gave some testimony, which was not very clear, to the effect that upon completion of the contract by Electro if Vogue's debt to Tanenbaum had been satisfied, any remaining balance was to go to Vogue. And he asserted that Lawrence Tanenbaum told him that "if we continued the contract, we could expect a reduction in the price" of material, the inference being that after the subcontract in some way Vogue was to receive credits on its obligations to Tanenbaum and in addition any surplus remaining after the interests of the various parties were satisfied.

If Vogue was entitled to a credit for work done on the finished and unfinished bags, how was it to be handled? All of the proceeds were assigned to the Bank of Manhattan. If they were deposited in a special account there, what would be the priorities as between the United States and Tanenbaum as to Vogue's credit? If pursuant to the assignment the check had been delivered to or received by the Bank of Manhattan, in accordance with the August 20 agreement to give instructions for distribution of the fund represented thereby, and if Vogue was entitled to receive any part of the proceeds thereof either by reason of those instructions, or if none were given but by reason of the understanding which produced the August 20 agreement Vogue was to receive a

part thereof, the tax lien would attach to that share. And the lien would have priority over Tanenbaum even though Vogue had agreed and so instructed the bank to turn the share over to Tanenbaum as a credit on existing indebtedness. *Cf. U. S. v. Warren R. R.*, 127 *F. 2d* 134 (*2d Cir.* 1942); *Citizens State Bank v. Vidal, supra; Bankers Title and Abstract Co. v. Ferber Co., supra,* at *page* 444.

Tanenbaum argues that after the subcontract, Vogue had no further interest in the prime contract or the proceeds, and that thereafter no part of the proceeds constituted tangible or intangible property belonging to Vogue. If this is true, what is the significance of the November 19, 1952 letter of Electro and Tanenbaum to the bank? The date attracts attention. It was six days after the $6,284.25 check had been issued to Vogue. Tanenbaum then knew of the check and had demanded possession of it. And this replevin action was instituted nine days later. The letter said in part:

"This is to confirm that any moneys received by you under your assignment may be applied by you as you see fit toward the payment of the obligations of Vogue Foundations, Inc. to you or, in your discretion, may be paid over to Vogue Foundations, Inc., or credited to its account with you, and we shall have no claim whatsoever against you with respect to any such moneys."

The check in litigation was the only one outstanding at this time, so far as the record shows. If its disposition was controlled by the assignment and therefore it was expected to go to the bank, what interest of Vogue prompted the writing of the letter by Tanenbaum and Electro?

It may very well be that the full facts will provide adequate answers to all of the questions posed. But we think that the shift of theory pursued by Tanenbaum at the trial probably prevented the government from preparing to meet them. In justice, such opportunity should be given.

Moreover, we find no legal justification for a determination that the check in dispute belongs to Tanenbaum. The proceeds of the contract were assigned to the Bank of Manhattan presumably in accordance with the tripartite agree-

ment of Vogue, Tanenbaum and Electro. And it was agreed that appropriate instructions would be given by each of them to the bank to accomplish the proper disbursement of the funds. The only directions disclosed by the proof are those contained in the letter of November 19.

Thus it would appear that legal ownership of the check is in the bank and not in Tanenbaum. An abortive effort was made to show a judgment in some litigation in New York allegedly to establish lack of interest of the bank in the contract proceeds. Enough of the circumstances of that litigation do not appear to enable us to consider its competency or relevancy.

Moreover, Electro became the subcontractor, not Tanenbaum. Electro performed the relatively minor amount of work on the bags which was left unfinished by Vogue. And Electro shipped and billed them to the government. Obviously the check was drawn to Vogue because it was the named prime contractor and the bank's assignment had not yet been filed. In this posture, Tanenbaum's claim to ownership thereof is no greater than that of Electro.

On the record now before us, both Electro and the Bank of Manhattan would appear to be indispensable parties to a complete adjudication of the rights in the check. Further, on the exhibits and proof submitted, Tanenbaum failed to establish that it is entitled to a finding of ownership thereof.

The judgment is therefore reversed and a new trial ordered to the end that both phases of the case we have discussed may be presented fully to the trial court.