**In re HLW ENTERPRISES OF TEXAS, INC., Debtor.**

**VULCAN MATERIALS COMPANY, Plaintiff,**

v.

**JACK RAUS, INC., United States (IRS) and HLW Enterprises of Texas, Inc., Defendants.**

**Bankruptcy No. 91–54681–LMC. Adv. No. 92–5210–LMC.**

United States Bankruptcy Court, W.D. Texas, San Antonio Division.

Aug. 5, 1993.

Stephanie O'Rourke, Douglas & Elms, Inc., San Antonio, TX, for Vulcan Materials.

Manuel P. Lena, Jr., U.S. Dept. of Justice, Tax Div., Dallas, TX, for U.S.

Nancy Hamren, Coats, Rose, Vale, Holm, Ryman & Lee, Houston, TX, for Jack Raus, Inc.

## DECISION AND ORDER

LEIF M. CLARK, Bankruptcy Judge.

CAME ON for trial the foregoing cause. Upon consideration thereof, the court finds and concludes as follows.

### JURISDICTION

This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b) and (d). This is a core matter as set forth in 28 U.S.C. § 157(b)(2)(K).

### BACKGROUND

PMSI–Wurzbach, Inc. ("PMSI") is the owner of a parcel of real property located in Bexar County, Texas. PMSI contracted with Jack Raus, Inc. ("Raus") to construct a mini-storage warehouse on its real property (the "Project"). Raus subcontracted with HLW Enterprises of Texas, Inc. ("HLW"), the debtor in this chapter 7 case, for HLW to supply all the labor and material necessary to complete certain concrete work on the Project. Between April and June 1991, Vulcan Materials Company ("Vulcan") supplied $27,932.64 worth of materials to the project at the request of HLW.

PMSI paid Raus; Raus paid HLW, less monies retained under their contract, but HLW failed to pay Vulcan the $27,932.64 due and owing for the materials supplied on the Project. On August 16, 1991, Vulcan filed a Mechanic's and Materialmen's Lien against HLW for $9,113.31. On October 11, 1991, Vulcan filed a Supplemental Affidavit for Mechanic's and Materialmen's Lien against HLW for the same amount. On November 20, 1991, Vulcan filed its Application for Writ of Garnishment against Raus for any funds Raus held on the project for HLW. At the time, Raus was holding $23,871.94 in funds it had retained on the contract with HLW to ensure that all subcontractors on the Project were compensated for their labors and materials.

HLW also had its difficulties with the Internal Revenue Service (the "IRS"). Over a two year period, HLW failed to pay its federal unemployment taxes. The IRS made tax assessment against HLW on March 4, March 11, and June 11, 1991 (the "Tax Assessments"). HLW failed to satisfy any of these assessments. Eventually, on July 19, 1991, the IRS filed federal tax liens totalling $39,693.27 against HLW. The IRS made an additional Tax Assessment against HLW on September 9, 1991,

and filed another federal tax lien for $36,-268.25 against HLW on September 20, 1991 and October 1, 1991. On September 10, 1991, the IRS served upon Raus its Notice of Levy against HLW for $66,737.11, seeking to satisfy the Tax Assessments through any funds held by Raus due and owing to HLW.

On December 6, 1991, HLW filed for chapter 7 bankruptcy. On May 7, 1992, Vulcan and HLW entered into an Agreed Order in the bankruptcy proceeding, acknowledging and stipulating to Vulcan's $66,955.76 claim against HLW; the court later entered a default judgment against HLW in favor of Vulcan.

On June 2, 1992, Raus interpleaded into the registry of the court $23,871.84 (the "Interpleaded Funds") which it was then holding for HLW, its subcontractor. Vulcan, HLW's supplier, claims a superior right to this fund over the IRS, arguing that Raus held the funds in trust for the benefit of material suppliers such as itself, so the IRS' lien could not attach to the fund (because the fund did not "belong" to HLW). The IRS, on the other hand, claims that it has superior rights to the monies pursuant to its Tax Assessments and Notice of Levy. Raus, as an innocent stakeholder, claims it is entitled to attorneys' fees incurred due to the litigation.

## DISCUSSION

### I. The Tax Lien v. Materialmen's Trust Funds

#### A. Federal Tax Liens

The IRS asserts that it has a valid tax lien on the Interpleaded Funds due to the Tax Assessments and the Notice of Levy served upon Raus. Under 26 U.S.C. §§ 6321 and 6322, a federal tax lien arises upon the date that the IRS assesses unpaid taxes and continues until the debt is fully satisfied. *Texas Commerce Bank–Fort Worth, N.A. v. United States,* 896 F.2d 152, 161 (5th Cir.1990). Federal tax liens are effective against all property and rights to property, whether real or personal, including after acquired property belonging to the taxpayer. 26 U.S.C. § 6321.

If the tax debt remains unpaid post-assessment, the United States is entitled to enforce the assessment lien by levy. 26 U.S.C. § 7403.

For purposes of determining priority between a federal tax lien and a competing lien, "absent provision to the contrary, priority for purposes of federal law is governed by the common law principle 'first in time is the first in right.'" *United States v. McDermott,* —— U.S. ——, 113 S.Ct. 1526, 123 L.Ed.2d 128 (1993); *United States v. New Britain,* 347 U.S. 81, 85, 74 S.Ct. 367, 370, 98 L.Ed. 520 (1954). However, a federal tax lien "shall not be valid as against any ... mechanic's lienor ... until notice thereof which meets the requirements of subsection (f) has been filed by the Secretary." 26 U.S.C. § 6323(a). A competing lien, to be in existence for "first in time" purposes, must have been perfected in the sense that the identity of the lienor, the property subject to the lien, and the amount of the lien are established. *McDermott,* —— U.S. at ——, 113 S.Ct. at 1527; *New Britain,* 347 U.S. at 85, 74 S.Ct. at 370.

Here, the IRS made its assessment against HLW on March 4, 1991, March 11, 1991, and June 11, 1991, and HLW failed to pay these debts. As the IRS federal tax lien arose on the dates of the assessments, the IRS lien encumbered all of HLW's property and rights to property, including the rights HLW had under the Raus–HLW subcontract and any funds HLW earned under that subcontract. *Glass City Bank v. United States,* 326 U.S. 265, 66 S.Ct. 108, 90 L.Ed. 56 (1945) (federal tax lien arises and attaches to all property or rights to property of taxpayer, including property acquired after the date of assessment); *Randall v. Nakashima,* 542 F.2d 270, 274 (5th Cir.1976) (taxpayer's right to proceeds of wholly executory contract possessed realizable value and was right to property subject to IRS tax lien).

#### B. Materialmen's Trust Funds

While Vulcan did perfect a mechanic's and materialmen's lien for

$9,113.31 on August 16, 1991, pursuant to Tex.Prop.Code Ann. § 53.001 *et seq.*, Vulcan is not asserting its rights as a mechanic's lienor. If it were, the mechanic's lien would not be satisfied by the Interpleaded Funds since the majority of the federal tax liens attached before the mechanic's lien was perfected, and the sum of the federal tax liens exceeds the amount of the Interpleaded Funds. Vulcan rather asserts that the Interpleaded Funds are held in trust for Vulcan by Raus pursuant to section 162.001 of the Texas Property Code. TEX. PROP.CODE ANN., § 162.001 (Vernon Supp. 1993). Vulcan correctly notes that a federal tax lien may only attach to property in which a taxpayer has an interest. 26 U.S.C. § 6321; *Transmix Concrete of Rockdale v. United States*, 142 F.Supp. 306, 310 (W.D.Tex.1956). A taxpayer's interest in property is determined by state law. *United States v. Durham Lumber Company*, 363 U.S. 522, 80 S.Ct. 1282, 4 L.Ed.2d 1371 (1960). If, under state law, the fund held by Raus are impressed with a trust such that HLW has no interest in the fund, then the tax lien would not attach to the fund. Further, if the trust arises in favor of materialmen such as Vulcan, then Vulcan could lay a superior claim in the fund. We turn, then, to a determination of the parties rights in the Interpleaded Funds under Texas state law.

■ In Texas, funds paid to a contractor or subcontractor are held in trust for those mechanics, materialmen, artisans and other laborers which have worked on a given construction project. Section 162.001 of the Texas Property Code provides:

> Construction payments are *trust funds* under this chapter if the payments are made to a contractor or subcontractor, under a construction contract for the improvement of specific real property in this state.

TEX.PROP.CODE ANN., § 162.001 (Vernon Supp.1993). At the time of the IRS Notice of Levy, PMSI had paid Raus for construction on the Project. Raus held back retainage, including $23,871.84 retained under its construction subcontract with HLW for the benefit of HLW's subcontractors and suppliers. Vulcan claims that HLW has no ownership rights or claim on this retained amount, because it serves as a trust fund for the benefit of unpaid subcontractors and suppliers of HLW, such as Vulcan.

The IRS reads section 162.001 to mean that no trust arises for a materialman until the party with whom that materialman directly contracted receives payment on the project. For example, no trust could arise for HLW until Raus received payment from PMSI. And no trust could arise in favor of Vulcan until HLW is paid by Raus. The IRS contends that funds are held in trust only by the contractor for the benefit only of those subcontractors and materialmen with which the contractor is in direct privity. Then a new trust would arise when that contractor pays a subcontractor, running in favor of that subcontractor's own subs and suppliers. Therefore, under the IRS construction, because payment in this case never got down the chain to HLW, no trust in favor of HLW's supplier, Vulcan, could arise. The funds, it claims, while in the possession of Raus are held in trust only for Raus' subs and suppliers (including HLW), not for anyone one step or more removed from Raus.

The IRS relies heavily on *In re Southwestern Fabricators, Inc.*, 40 B.R. 790 (Bankr.W.D.Tex.1984), a case factually similar to the one at bar. In *Southwestern Fabricators*, a contractor, Bowden, agreed to construct a pipeline for Oasis Pipeline Co. Bowden subcontracted work to Southwest Fabricators, Inc., later the debtor in bankruptcy, who in turn subcontracted with J & J Steel, Co. for the supply of some steel. Eventually, Bowden got paid, but Southwest Fabricators filed for bankruptcy before paying J & J Steel. J & J argued that Bowden held the fund in trust for it under article 5472e of the Texas Revised Civil Statutes (the predecessor to § 162.-001). The court, finding that no trust existed in favor of J & J Steel stated:

> The statute clearly omits inclusion in the trust fund any monies which merely might be due or owing to the subcontractor .. the monies actually must have been paid to the subcontractor, but are

still held by Bowen (or possibly held by the owner, Oasis Pipeline Co.). One might argue that there is no benefit to mechanics and materialmen impressing a trust fund against monies only after they come into the possession of the debtor, because the debtor could either conceal the monies or could dispose of those monies in such fashion that the creditors could not trace them. That result is a definite possibility. However, the statute literally requires that the monies shall have been paid to Southwestern Fabricators, Inc., before the benefit of J & J Steel exists.

*Southwestern Fabricators,* 40 B.R. at 792.

■ While this is a plausible construction of the trust fund statute, we read the statute to afford greater protection to materialmen. The wording selected by the Texas Legislature specifies that a trust fund arises in favor of materialmen "... if the [construction] payments are *made* to a *contractor or a subcontractor.*" TEX. PROP.CODE ANN., § 162.002 (Vernon Supp: 1993) (emphasis added). Thus, once the owner makes a payment to *either* the general contractor or to a subcontractor, that payment gives rise to a trust for all parties in the subcontract chain. Here, when Raus received payment, Raus held the monies otherwise due to HLW, as well as the portion of those monies due in turn to Vulcan, in trust for those respective parties. The trust in favor of all subs and suppliers below the contractor would not expire simply because the contractor then pays the subcontractor, but would rather continue in those funds for the benefit of all subs and suppliers in the chain below that subcontractor.

■ Section 162.001 was enacted to protect materialmen, laborers, contractors and subcontractors. *McCoy v. Nelson Utilities Services, Inc.,* 736 S.W.2d 160, 164 (Tex.Civ.App.—Tyler 1987, writ ref'd n.r.e.); *American Amicable Life Ins. Co. v. Jay's Air Conditioning and Heating, Inc.,* 535 S.W.2d 23, 26 (Tex.Civ.App.— Waco 1976, writ ref'd n.r.e.). The statute supplemented the remedies then available to laborers and materialmen. *Owens v.*

*Drywall And Acoustical Supply Corp.,* 325 F.Supp. 397, 400 (S.D.Tex.1971); *McCoy v. Nelson Utilities Services, Inc.,* 736 S.W.2d 160, 164 (Tex.Civ.App.—Tyler 1987, writ ref'd n.r.e.); *Stone Fort National Bank v. Elliot Electric Supply Company, Inc.,* 548 S.W.2d 441, 446 (Tex.Civ. App.—Tyler 1977, writ ref'd n.r.e.) (statute is additional protection over and above security provided by other statutes in favor of laborers and materialmen). Prior to the enactment of this statute, the statutory remedies protecting the rights of materialmen and laborers were limited to the right to sue on a contractor's performance and payment bond, TEX.CIV.STAT.ANN., art. 5160, and the right to file a lien against the real property on which work was performed, TEX.CIV.STAT.ANN., art. 5452 *et seq. Id.* Effectively, section 162.001 protects materialmen without any requirement for filing or notice or other action on the part of the materialmen as a prerequisite. *McCoy,* 736 S.W.2d at 164; *Stone Fort National Bank, Inc.,* 548 S.W.2d at 446.

■ As section 162.001 is a remedial statute, courts must give it a broad construction to effectuate its protective purposes. *Owens,* 325 F.Supp. at 397; *McCoy,* 736 S.W.2d at 164; *Stone Fort National Bank,* 548 S.W.2d at 446; *Panhandle Bank & Trust Co. v. Graybar Elec. Co., Inc.,* 492 S.W.2d 76, 81 (Tex.Civ.App.— Amarillo 1973, writ ref'd n.r.e.). We believe that the purpose of the statute is best served when the statute is read in accordance with its common sense meaning. The statute says that a trust arises when *"the payments are made to a contractor or subcontractor."* The materialmen at the end of the real property owner-contractor-subcontractor-materialmen chain is perhaps *most* in need of a trust in its favor arising from first payment. Otherwise, the subs and suppliers last in line are most vulnerable to diversion of funds due and owing to them by any one of a number of intermediate parties beyond the ultimate party in direct privity with them.

Consider, for example, the situation if the chain of privity is as follows: real property owner, general contractor, sub-

contractor I, subcontractor II, material-man. If the real property owner were to pay the contractor, and the contractor paid subcontractor I, who then misappropriates the money, what would the materialman's remedy be? The materialman could assert a lien against the real property of the owner, but if the owner has paid the contractor in full, that lien is worthless to the materialman. A materialmen's lien on real property does not create a debt against the owner, but merely appropriates so much of the money in the owner's hands as is due or may become due to the contractor, to the extent necessary to satisfy the materialmen's lien. *See Lonergan v. San Antonio Loan & Trust Co.*, 101 Tex. 63, 104 S.W. 1061 (1907). If we were to adopt the IRS' interpretation of § 162.001, then the materialman could not sue subcontractor I either. The contractor is not in privity with the materialman, so no breach of contract action would lie, and if no trust existed, the materialman could allege no cause of action for breach of fiduciary duty against subcontractor I. Finally, the materialman could conceivably be unable to recover against the subcontractor with whom the materialman is in privity since, in such contracts, the subcontractor often promises to pay the materialman within a specified number of days after the subcontractor receives payment from the contractor, or if there is no such contract provision, the lawsuit could be fruitless if the subcontractor is judgment proof.[1] Hence, the materialman is only afforded the protection afforded by the statute if the trust relationship is imposed all the way up the chain to the original contractor once a payment on the construction project is made by the owner, and all the way back down the chain for every one who have worked on the project or supplied materials to the project.

■ Because the Interpleaded Funds are found to be trust funds for the benefit of Vulcan, HLW had no rights to the funds absent a showing that all obligations to

Vulcan in connection with the construction project have been fully paid and satisfied. *Panhandle Bank & Trust Co.*, 492 S.W.2d at 81; *United States v. Peden Iron & Steel Co.*, 330 S.W.2d 635, 637 (Tex.Civ.App.—Texarkana 1959, writ ref'd n.r.e.) ("since the claims of materialmen and laborers greatly exceeded the [trust fund] ... neither the taxpayer-contractor nor the Government had any right to such fund"). As HLW had no rights to the Interpleaded Funds, the IRS levy was ineffective and did not attach to the fund. "The rights of the Government can rise no higher than those of the taxpayer. The lien does not, however, extend to the property of anyone other than the person liable for the tax.'" *Transmix Concrete of Rockdale v. United States*, 142 F.Supp. 306, 310 (W.D.Tex. 1956).

## II. RAUS' CLAIM FOR ATTORNEYS' FEES

■ Raus claims, that as an innocent stakeholder, it is entitled to tax its attorneys' fees against the Interpleaded Funds. Raus' involvement in this adversary proceeding resulted from the competing claims of the IRS and Vulcan to the funds Raus retained under its contract with HLW to ensure that all materialmen were paid for the Project. On September 10, 1991 the IRS served its Notice of Levy against HLW upon Raus, and on November 20, 1991, Vulcan filed its Application for Writ of Garnishment against Raus. In response to the Application for Writ of Garnishment, Raus filed its Original Answer, Counter-Claim and Third Party Claim for Interpleader in this adversary proceeding. Raus deposited the Interpleaded Funds into the registry of the court on June 2, 1992.

■ When funds are interpleaded into the court by an innocent stakeholder pursuant to Bankruptcy Rule 7022, the bankruptcy court, as a court of equity, has the discretion to award attorneys fees to the

---

1. Of course, if the construction project was initiated by the state, Tex.Civ.Stat.Ann. art. 5160 requires that a payment bond be issued for the protection of the materialman. However, that applies only to public works projects. Further-

more, the purpose of section 162.001 was to protect the materialman *automatically* without the need to file a lien or initiate a law suit to collect its debts. *McCoy*, 736 S.W.2d at 164; *Stone Fort National Bank*, 548 S.W.2d at 446.

innocent stakeholder. In one of the earliest decisions addressing this issue, a circuit court remarked:

> In the case before us, a mere stakeholder, without fault himself, in possession of a fund claimed entire by contending parties, (but, as the result shows, equal rights and claims thereto,) brings the same into court, thereby promoting the litigation and securing the due application of the property. From the nature of the contending claims and the circumstances of the case he incurs expense and counsel fees in bringing the fund into court. There is no equity in compelling him to bear these charges. On the contrary, the parties who have benefited thereby should bear them.

*Louisiana State Lottery Co. v. Clark*, 16 F. 20, 21 (C.C.D.La.1883).

▮ Since that time, courts of equity have sometimes allowed innocent stakeholders to recover reasonable attorneys fees incurred in the interpleader action. *See, e.g., Algemene Bank Nederland v. Soysen Tarim Urunleri Dis Ticaret Ve Sanayi, A.S.,* 748 F.Supp. 177, 184 (S.D.N.Y.1990) (innocent stakeholder could recover attorney fees in interpleader action to extent fees incurred in filing, service, and litigation of interpleader). Stakeholders are considered "innocent" when not guilty of wilful misconduct or gross negligence, and act to transfer the claimed funds to the court for a determination in rights to them. *See Cockrell v. United Bank of Denver National Assoc.,* 664 F.Supp. 1398, 1401 (D.Colo.1987). This recovery may be taxed against the interpleaded funds. In a case factually similar to the one at bar, a general contractor held funds to which several subcontractors and a bonding company laid claim. *See United State Fidelity and Guaranty Co. v. Sidwell,* 525 F.2d 472, 475 (10th Cir.1975). The general contractor claimed no interest in the funds, and deposited the monies into the registry of the court. The court found it proper to charge the general contractor's reasonable attorneys' fees against the interpleaded funds before distributing the

balance to the rightful owner or owners. *Id.*

In the instant interpleader action, Raus has laid no claim to the Interpleaded Funds, and quickly deposited the funds with the court when the dispute to the monies arose. Raus submits that it has incurred $10,000.00 in attorneys' fees. Under existing case law, Raus is entitled to the reasonable fees incurred in drafting its answer, counter-claim and claim for interpleader. Counsel for Raus also appeared at the hearing on this matter. The reasonable value of Raus attorneys' fees in this matter is $3,000.00.

### CONCLUSION

For the reasons set forth herein, the court concludes that the Interpleaded Funds were held in trust for Vulcan by Raus. The IRS Notice of Levy served upon Raus was ineffective since HLW had no interest in the funds. The court, therefore, awards the Interpleaded Funds to Vulcan, less $3,000.00 in attorneys' fees payable to Raus from the Interpleaded Funds.

So **ORDERED.**