In re James R. FAULKNER, Debtor.

AIRTRON, INC., Plaintiff,

v.

James R. FAULKNER, Defendant.

Bankruptcy No. 96–52651.
Adversary No. 96–5177–C.

United States Bankruptcy Court,
W.D. Texas,
San Antonio Division.

Oct. 3, 1997.

Rand J. Riklin, San Antonio, TX, for Defendant.

Thomas J. Walthall, Jr., Gardner & Ferguson, Inc., San Antonio, TX, for Plaintiff.

Claiborne B. Gregory, Jr., San Antonio, TX, for Debtor.

Johnny W. Thomas, San Antonio, TX, Trustee.

## DECISION ON COMPLAINT OBJECTING TO DISCHARGEABILITY OF CERTAIN DEBTS

LEIF M. CLARK, Bankruptcy Judge.

CAME ON for trial the foregoing matter. Before hearing oral argument, the parties presented, and the court accepted, a stipulation regarding the relevant facts. The essential legal issue presented for resolution is this: was a fiduciary relationship within the meaning of 11 U.S.C. § 523(a)(4) present under the facts of this case and did the defendant-debtor violate his duties with respect to that relationship. On consideration of the briefs submitted by the parties, the arguments of counsel, applicable case law and the stipulated facts of this case, the court now issues this decision and order.

### Background Facts

The plaintiff in this case, Airtron, Inc., is a residential heating, ventilation and air conditioning ("HVAC") subcontractor who performs a substantial amount of work in the Bexar County area. The defendant debtor, James R. Faulkner, was one of two limited partners in a limited partnership called Houser Custom Homes, Ltd. ("HCH"), a real estate development limited partnership established to build and market new homes (the other limited partner was James L. Houser). See Defendant's Ex. 17. Faulkner and Houser were also the owners, organizers, managers and officers of an entity known as Faulkner–Houser LLC. Faulkner was the president of the LLC. The LLC was named as the general partner of HCH. The unusual structure of the HCH partnership is the subject of much debate in this case and thus worthy of discussion.

According to the limited partnership agreement, HCH was "required" to use Houser as its construction supervisor and to compensate him three percent (3%) of the sales price of each house for said services, payable not upon completion of construction of each house but rather upon completion of the concrete slab. See Defendant's Ex. 17, at ¶ 3(a).[1] Thus, per the terms of the limited partnership agreement, Houser was, as a practical matter, able to insist on being paid in advance for the bulk of his services. HCH was also "required" to use the services of Faulkner as its real estate salesperson to market the houses. Id. at ¶ 3(b).[2] One half of the agreed 6% commission became due and payable (once again) upon completion of the concrete slab, even though, at that stage, there might not yet even be a buyer (and even though the sales price would not be finally determined until a sale had been consummated). By these devices, then, Faulkner and Houser both assured themselves an "early cut" from the construction draws, even if the houses were ultimately not completed, or not sold, and even if other subcontractors might end up not being paid.[3] And, as it turned out, some subcontractors were not paid on at least some of the houses. One of those was Airtron.

Between April, 1995 and August, 1995, Airtron was hired as a subcontractor by HCH to install HVAC systems in at least nine of the houses HCH built. HCH (the general) was paid, but Airtron (the sub) was not fully paid on five of them. Airtron concedes that it was Houser (and not Faulkner) who was the one directly responsible for nonpayment, as Houser supervised construction (including

---

1. "The General Partner [*i.e.*, the LLC] *shall* incur the services of James L. Houser for the purpose of supervising all construction and *shall* pay the sum of three percent (3%) of the sales price of each respective house, said amount to be paid upon the completion of the concrete slab of each respective house."

2. "The General Partner [LLC] *shall* incur the services of James R. Faulkner of Century 21 Northside, to exclusively market Houser Custom Homes, and to list for sale and sell said homes prior to, during and after construction, and shall pay a commission of six percent (6%) to be allocated as determined by James R. Faulkner,

with three percent (3%) being paid upon the completion of the concrete slab, and three percent (3%) to be paid upon completion, closing and funding on the sale of each house."

3. Faulkner describes this arrangement as a substitute for salaries, though that characterization is charitable at best, especially as it applies to Faulkner himself. Faulkner resigned as an officer of Faulkner–Houser, LLC and as limited partner in HCH in August 1995, when the difficulties with cash flow and nonpayment came to light.

construction billing and payment).[4] Airtron nonetheless seeks recovery from Faulkner as well, who has, of course, since sought the protection of the Bankruptcy Code, alleging that Faulkner is in breach of The Texas Construction Trust Fund Act, and so has an affirmative liability to Airtron which cannot be discharged in bankruptcy. *See* TEX. PROP. CODE ANN. §§ 162.001–162.003, 162.031(a) (West 1995); 11 U.S.C. §§ 523(a)(4). That is, it claims that Faulkner has violated a fiduciary duty that he owes to Airtron and therefore should not receive the benefit of a bankruptcy discharge from this particular debt.

### Stipulations

The following substantive stipulations[5] were entered by the parties just prior to the commencement of trial:

(1) During the relevant period [*i.e.,* April 1995 through August 1995], Airtron performed HVAC services on every HCH project.

(2) Of the nine projects in which HCH was involved, Airtron was not fully paid on five.

(3) At the time the commissions [*i.e.,* the commissions due to Faulkner and to Houser pursuant to the terms of the HCH Limited Partnership Agreement] were paid on each project, there were no current or past due obligations incurred by or owing to Airtron.[6]

(4) Faulkner had no knowledge of any current or past due obligations incurred by or owing to Airtron by HCH, Ltd. until Faulkner was served with Airtron's state suit on or about July 30, 1996.[7]

(5) After the filing of the state lawsuit, Faulkner made no payments to Airtron.

(6) Faulkner was a signatory on the HCH, Ltd. operating account at all relevant times. With the exception of three checks, Faulkner signed or co-signed all checks of HCH, Ltd. from May 1995 through August 1995.

(7) The commissions paid to Faulkner and Houser were made pursuant to section VI–A.3. of the HCH, Limited Partnership Agreement. *See* Exhibit D–17. That agreement required the general partner to retain the services of Houser to supervise all construction and required the general partner to use James Faulkner as the exclusive real estate marketer for HCH, Ltd. Payment for each of the services was set at 3%, payable upon completion of the house slab [with the balance of Faulkner's real estate commission payable upon sale of the house].

### Analysis

Airtron claims that the "debt" that Faulkner "owes" should be held to be nondischargeable under section 523(a)(4) of the Bankruptcy Code. That section provides:

A discharge under section 727, 1141, 1228(a), 1228(b) or 1328(b) of this title does not discharge an individual debtor from any debt—

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny.

11 U.S.C. § 523(a)(4).

█ For a debt to be excepted from discharge under this section, then, a plaintiff must, *inter alia,* establish the presence of a

---

**4.** Houser was in the homebuilding business before he went into business with Faulkner, and Houser's relationship with Airtron goes back into the late 1980's.

**5.** The parties also reached a stipulation regarding the accuracy of three specific exhibits and a stipulation that all exhibits but three would be tendered without objection. The three "objectionable" exhibits were removed from our consideration by agreement.

**6.** Exhibits were attached to the settlement (and also included in the exhibits) which track the time-line in this regard.

**7.** The import of this stipulation is that Houser did not advise his partner of the status of delinquent accounts, or difficulties in cash flow on the projects, or the like. It was primarily Houser's responsibility to see to the actual construction of houses, including the retention and payment of subcontractors.

**664**

fiduciary relationship, and conduct constituting defalcation on the part of the debtor while acting in that capacity, resulting in an indebtedness to the plaintiff.[8] In this case, the fiduciary relationship is said to have arisen as a result of the operation of the Texas Construction Trust Fund Act, as that act has been held to operate in the context of a later bankruptcy proceeding. *See Matter of Nicholas,* 956 F.2d 110, 113 (5th Cir.1992). The parties here focus their dispute over the date the trust may be said to have arisen. That is, the debtor argues that there can be no "fiduciary relationship" (and hence no defalcation) because the "trust" in question had not yet come into existence under Texas law when the alleged violation of fiduciary duty is said to have occurred. The debtor also claims that he could not possible have violated any fiduciary duty because he lacked the necessary *scienter.* Finally, the parties dispute whether the payments made to Faulkner actually triggered a defalcation of the relevant fiduciary duty at all under Texas law, or whether instead they fall within a statutory exception for "actual expenses directly related to the construction or repair of [an] improvement." *See* TEX. PROP.CODE ANN., §§ 162.005, 162.031(a).

We will here first generally flesh out the parameters of what constitutes a fiduciary relationship within the meaning of section 523(a)(4). We will then address the specific disputes raised by the parties.

A. FIDUCIARY RELATIONSHIP UNDER SECTION 523(A)(4)

There is little dispute in the case law regarding what constitutes a defalcation if a fiduciary relationship is present. *See Central Hanover Bank & Trust Co. v. Herbst,* 93 F.2d 510 (2d Cir.1937) (Hand, J.); *Old Republic Surety Co. v. Richardson (In re Richardson),* 178 B.R. 19, 27–30 (Bankr.D.C. 1995). In essence, if the fiduciary relationship imposes certain obligations on the debtor, and the debtor fails to perform those obligations, then a defalcation will be made out. *See LSP Investment Partnership v. Bennett (In re Bennett),* 989 F.2d 779, 790 (5th Cir.1993).

■ No *scienter* need be established in order to prove a defalcation, at least not in the sense that a plaintiff must show some *intent* to breach a fiduciary duty. However, the Fifth Circuit has recently held that there must be *some* level of mental culpability, and that a showing of wilful neglect would certainly meet that standard. *Schwager v. Fallas (Matter of Schwager),* 121 F.3d 177, 184 (5th Cir.1997). The court in a footnote seems to indicate that mere negligence will not be enough, noting that earlier cases only hold that "intent" is not required to be shown. *Id.,* at 184 n. 12. Thus, if a fiduciary relationship is established in this case, and a defalcation with regard to that fiduciary relationship, then we will be obliged to determine whether the requisite level of mental culpability has been established by the facts in this case.

■ The *sine qua non* for establishing an actionable defalcation, however, is the presence of a fiduciary relationship. Federal courts applying section 523(a)(4) are uniform in holding that the issue is controlled by federal law, not by state definitions. That is to say, not all relationships defined under state law as "fiduciary" are necessarily the sorts of relationships for which a nondischargeability action will stand under federal bankruptcy law. In general, the courts require that a "true" or "express" trust must be raised, as opposed to a trust *ex maleficio* (i.e., one which arises only as a result of the conduct which gave rise to the debt). *See Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 333, 55 S.Ct. 151, 154, 79 L.Ed. 393 (1934); *In re Bennett,* 989 F.2d at 784; *Boyle v. Abilene Lumber, Inc. (In re Boyle),* 819 F.2d

---

8. The parties do not, in so many words, dispute whether Faulkner actually *owes* a debt to Airtron. The Texas Construction Trust Fund Act itself imposes liability on "contractors." Section 162.002 of that Act states that "an owner or an officer, director, or agent of a contractor who receives trust funds or who has control or direction of trust funds, is a trustee of the trust funds." Thus, Faulkner, by virtue of his positions with both the LLC and HCH, would be at least potentially liable to an entity such as Airtron. For ease of reference, we will use the term "contractor" to refer to Faulkner, even though the actual contractor role was delegated to Houser.

583, 588 (5th Cir.1987); *Angelle v. Reed (In re Angelle)*, 610 F.2d 1335, 1338 (5th Cir. 1980); *Peerless Ins. Co. v. Casey (In re Casey)*, 181 B.R. 763, 766 (Bankr.S.D.N.Y. 1995).

■ This general rule has been altered somewhat in the context of construction trust fund statutes. These sorts of statutes are common in many states. They usually purport to raise a "trust" in favor of subcontractors or suppliers against contractors who have received payment on a given job ahead of them. The trust is discharged when the contractor applies the monies it receives towards the payment of these subcontractors or suppliers. Such statutes, while couched in trust language, may, but do not necessarily, create the requisite fiduciary relationship for purposes of section 523(a)(4) analysis.

Texas has such a statute, enacted at chapter 162 of the Texas Property Code. *See* TEX. PROP.CODE ANN., chapter 162 (West 1995). The Texas Construction Trust Fund Act raises a trust in favor of, *inter alia,* materialmen in the position of Airtron. TEX. PROP.CODE ANN. §§ 162.001–162.003 (West 1995). The statute provides that a contractor will be held to have "misapplied" these trust funds if

> [the trustee] ... intentionally or knowingly or with intent to defraud, directly or indirectly retains, uses, disburses, or otherwise diverts trust funds without first fully paying all current or past due obligations incurred by the trustee to the beneficiaries of the trust funds ...

TEX. PROP.CODE ANN. § 162.031(a) (West 1995). The same statute also provides a "safe harbor" for certain uses of these trust funds in the next subsection:

> It is an affirmative defense to prosecution or other action brought under Section (a) that the trust funds not paid to the beneficiaries of the trust were used by the trustee to pay the trustee's *actual expenses*

directly related to the construction or repair of the improvement ...

TEX. PROP.CODE ANN. § 162.031(b) (West 1995) (emphasis added).

The Fifth Circuit construed this statute in the context of a section 523(a)(4) nondischargeability action in *In re Nicholas,* 956 F.2d 110 (5th Cir.1992). The court found that the Texas statute, unlike similar statutes in Oklahoma and Arizona, did not of itself create an express trust, because it did not call for the segregation of funds in a separate, traceable account. Instead, the Texas statute excuses "misapplication" if the facts demonstrate that the funds were used to pay "actual expenses directly related to the construction or repair of [an] improvement." *Id.* at 112–14; *see also* TEX. PROP.CODE ANN. § 162.031(b) (West 1995). The court recognized that it was, in effect, shifting the burden of proof on what the state statute calls an "affirmative defense" to the creditor, but insisted that a proper construction of the statute in the context of a section 523(a)(4) required such a shift. *In re Nicholas* at 114. The upshot of *Nicholas,* then, is that the Texas statute *does* create a limited trust in favor of the creditor—if the funds in question were retained, used, or diverted to any use other than "actual expenses directly related to the construction or repair of [an] improvement," then they will be held to have been "misapplied" in a fashion that is actionable under section 523(a)(4).[9]

That an actionable trust under section 523(a)(4) may exist, we are constrained by *Nicholas* to next ask whether the contractor in this case misapplied trust funds in contravention of section 162.031(a) of the Texas Construction Trust Fund Statute. The more specific issue under our facts is whether the defendant "retained" trust funds without first fully paying all current or past due obligations. See TEX. PROP.CODE ANN. § 162.031(b) (West 1995).

9. One may quibble with the Fifth Circuit's analysis on this point, as it seems to *raise* the trust only in the event the debtor *acts* in a fashion prohibited by the statute, seemingly permitting an action to be brought on what amounts to a trust *ex maleficio.* Nonetheless, this court is constrained to follow what it views to be binding precedent. The Fifth Circuit has, in effect, carved out a special exception from its general rule regarding trusts *ex maleficio* (which are generally not actionable under section 523(a)(4)) for trusts "raised" by the conduct of contractors in misapplying funds subject to Texas' construction trust fund statute.

It will be remembered that the defendant here contests the very applicability of the Texas statute to the facts of this case because, among other things, the payments to the defendant were made before the plaintiff Airtron had even performed any services. Thus, the defendant claims that he could not possibly have diverted "trust funds without first fully paying all current or past due obligations incurred by the trustee," *see* TEX. PROP.CODE ANN. § 162.031(a) (West 1995), because when he paid himself, there were no debts outstanding to Airtron. In response, the plaintiff points out that the language in the statute does not, temporally speaking, require that the debtor act on a contemporaneous or prospective basis; the use of the word "retains" seems to suggest that a court ought to "look back" to see whether a given contractor continues to "retain" funds previously received when current or past due obligations later become due and remain unpaid.[10] *See id.*[11]

### B. WHEN A TRUST IS CREATED AND THE SCIENTER REQUIREMENT

■ To resolve our dispute, we turn to the applicable rules of statutory construction. According to Texas courts, this particular statute is to be construed broadly to effectuate the remedial purpose for which it was enacted, which was to protect the presumably "exposed" subcontractor or supplier. *McCoy v. Nelson Utilities Servs., Inc.*, 736 S.W.2d 160, 164 (Tex.Ct.App.—Tyler 1987); *Triton Oil & Gas Corp. v. E.W. Moran Drilling Co.*, 509 S.W.2d 678, 687 (Tex.Civ.App.—

Ft.Worth 1974); *Panhandle Bank & Trust Co. v. Graybar Elec. Co.*, 492 S.W.2d 76, 81 (Tex.Civ.App.—Amarillo 1973); *see also Vulcan Materials Co. v. Jack Raus, Inc. (In re HLW Enterprises, Inc.)*, 157 B.R. 592, 597 (Bankr.W.D.Tex.1993). We ought also to presume that the Texas Legislature intended the statute to have the meaning ordinarily accorded to the precise terms which it employed, giving effect to those words consistent with their common everyday meaning. *See Cail v. Service Motors, Inc.*, 660 S.W.2d 814, 815 (Tex.1983); *Ex Parte Roloff*, 510 S.W.2d 913, 915 (Tex.1974); *Sims v. Adoption Alliance*, 922 S.W.2d 213, 215 (Tex. App.—San Antonio 1996, writ denied). However, if the application of the statute's plain language would lead to absurd consequences that the legislature could not have possibly intended, then the statutory language should not be applied literally. *Sharp v. House of Lloyd, Inc.*, 815 S.W.2d 245, 249 (Tex.1991); *Meno v. Kitchens*, 873 S.W.2d 789, 792 (Tex. App.—Austin 1994); *King v. Texas Employers' Ins. Ass'n*, 716 S.W.2d 181, 183 (Tex. App.—Fort Worth 1986, no writ).

■ In the present instance, the plaintiff contends that the term "retains" means to not return. Thus, he contends, when Faulkner held onto the money he had already been paid for construction costs, he violated the Texas construction trust fund doctrine. Faulkner has not suggested an alternative interpretation for the term. We find the plaintiff's proffered interpretation to be consistent with the plain meaning of the statute and with the broad protection we are to

**10.** The confusion, we think, is partially caused by the fact that, on the one hand, state law would create a trust fund at the time any payments are made to a contractor or subcontractor for the construction of specific real property, *see* TEX PROP.CODE ANN. § 162.001 (West 1995), while applicable federal case law would only recognize that fund property for section 523(a)(4) purposes at the time the proceeds are "misapplied." *See In re Nicholas*, 956 F.2d at 114. Thus, state decisions have not had to decide what the term "retains" means in § 162.031 because, under state law, the trust automatically arises as soon as the money is paid to the contractor. Any diversion of those funds therefore is covered by that section's "uses" or "disburses" language. Federal decisions on 523(a)(4), meanwhile, do in

fact measure the trust from the "misapplication," as we must, but such decisions are issued so infrequently that no one has yet had to determine what "retains" means. We are therefore left with an issue of first impression.

**11.** For ease of review, we reiterate that the exact wording of the statute provides that a contractor will be held to have "misapplied" trust funds if

[the trustee] ... intentionally or knowingly or with intent to defraud, directly or indirectly retains, uses, disburses, or otherwise diverts trust funds without first fully paying all current or past due obligations incurred by the trustee to the beneficiaries of the trust funds

TEX. PROP.CODE ANN. § 162.031(a) (West 1995).

presume, and so adopt it as our own[12]— "retains" includes the notion of not returning funds already paid. Indeed, it is more logical to think that this is what the term encompasses, because the notion of retention incorporates the notion of prior payment.[13]

Accordingly, we find that while the funds in question were not part of a section 523(a)(4) trust until the "misapplication," the continued retention of such funds after that point might constitute such a misapplication and so violate the Texas construction trust fund law. Such an unlawful retention could thus constitute a breach of a fiduciary duty for section 523(a)(4) purposes.

■ Having found that retention of the funds was sufficient to trigger the fiduciary obligation under section 523(a)(4), we must turn now to the debtor's scienter argument. At the time this case was tried, the Fifth Circuit had not yet issued its decision in Matter of Schwager, 121 F.3d 177 (5th Cir. 1997).[14] There is little doubt that, if a diversion or retention or use occurred (and we believe it did), the misapplication did not occur with any actual intent to defraud, see Stipulations infra. Moreover, according to the Stipulations, Faulkner first learned of the existence of the outstanding Airtron account when he was sued, just shortly before the bankruptcy case was initiated. True enough,

once Faulkner was sued, he did not immediately return the funds in question, but it is difficult to find that a failure to immediately capitulate in the face of a lawsuit constitutes the requisite mental culpability that we are compelled to find in order to make a defalcation charge "stick." See Matter of Schwager, 121 F.3d, at 184.[15]

Because we find that the defendant lacked the requisite level of "mental culpability" to trigger liability for purposes of section 523(a)(4), we need not decide whether the defendant could make out a successful defense to liability under section 162.031(b) of the state statute (as is otherwise required by Nicholas). However, in the interests of furnishing any appellate court a complete record, we set forth our findings on this issue in any event, to minimize the necessity for a remand should an appellate court disagree with our conclusion regarding scienter.

C. DEFENSES TO THE CONSTRUCTION TRUST FUND CREATION

■ The debtor claims that the 3% in payments that he received under the HCH contract fall within the Chapter 162 exception for "actual expenses directly related to the construction or repair of the improvement." The statutory exception applies here,

---

12. It may well be that the Texas Legislature will want to reexamine this language to be sure that it accomplishes what it intended. In light of the continual confusion that this statute causes in bankruptcy cases, we in fact invite them to do so.

13. We could posit an alternative reading, of course. "Retain" might apply only to the retention of funds received only at a point when there are also current or past due obligations outstanding. This reading has some appeal, except that it fails to cover the very sort of device employed by Faulkner and Houser in this case simply paying oneself early, before obligations build up. In light of the purpose of the statute, we do not find it likely that the Texas Legislature intended to invite contractors to "skim off the top," as it were, thereby avoiding their trust fund obligations to subcontractors and suppliers. Indeed, it seems likely that such "first cuts" would actually exacerbate a contractor's cash flow difficulties, rendering it even more likely that those subcontractors and suppliers who supply materials and services relatively late in the construction process would find the cupboard bare. We view the clear intent of the legislature to assure that, if

someone is not going to be paid at the end of the day, it be the contractor who controls the payments and presides over the funds intended to be encumbered by this statutory trust, and not the unfortunate subcontractor or supplier whose services and goods are only provided late in the day by virtue of the construction schedule.

14. Schwager was issued August 22, 1997. This case was tried July 23, 1997.

15. We recognize that the state statute sets out the requirements in the disjunctive, confirming that no affirmative intent not to repay or intent to defraud need be established under section 162.031. TEX. PROP.CODE ANN., § 162.031(a) (West 1996). What may be enough to establish culpability under the state statute is beside the point, however. In a section 523(a)(4) action, the "mental culpability" requirement is imposed by federal, not state, law. See Matter of Schwager, supra. Whether a Texas court would also find that "retain" includes failure to promptly capitulate to a suit making demand for payment is an issue which we ought not, and so do not, reach in this, a federal case.

argues the debtor, because the compensation payments are directly tied to each job and because the debtor could not be expected to work for free. We disagree.

We start our analysis by reiterating that this statute is to be construed broadly to effectuate the remedial purpose for which it was enacted, which was to protect the presumably "exposed" subcontractor or supplier. *See, e.g., Vulcan Materials Co.,* 157 B.R. at 597. We also note that in parsing the language of the statute itself, the Texas Legislature used adjectives such as "actual" and "direct," and tied those adjectives to the "construction" or "repair" of the improvements in question, strongly indicating that, while payments to other suppliers, or to workers actually making the improvements, or to subcontractors working on the job might be sheltered, more "indirect" payments, such as overhead to the contractor in question, or "profit" built into the job's price, would not so qualify. Because the question is a close one, however, we turn to legislative history before rendering a final decision. That history is tracked in Texas Attorney General Opinion JM–945. Tex.Atty. Gen. Op. JM–945 (1988).

In Attorney General Opinion JM–945 we find, *inter alia,* a discussion between two Texas representatives—Representative Robnett and the House sponsor of the bill, Representative Parker—which may help explain the bill's intended parameters:

Representative Robnett:

Do you intend that it is o.k. for a builder to pay his superintendent, secretary, computer, pick-up trick, office or any administrative expenses and other similar expenses related to the construction of a home out of these trust funds?

Representative Parker:

I think, yes, I certainly do and I [want to] direct your attention, Buzz—I think it's important—to that "directly related" now. I think there has to be a—maybe you might ask a "but for" question. *And "but for" the construction would I need to*

*spend this money. And if it's related to construction, I think its exempted.* I do not think it presents a problem.

Tex.Atty. Gen. Op. JM–945, 4163 (1988) (additions in original) (emphasis added).

While the exchange is not as clear as we might desire on the point now before the court, it seems at least to indicate that expenses would have to be parsed into those directly incurred for a specific job, although not necessarily requiring there to be a direct physical effect on the construction site—*e.g.,* the cost of a part-time bookkeeper to monitor the progress of a particular job site—and those non-attributable expenses incurred whether the office was working on one job or a hundred—*e.g.,* the monthly expense of a telephone. Only the former expense appears to fall within the exception to misapplication of trust funds established by § 162.031(b). This interpretation is supported by the Attorney General's concluding paragraph:

the words of section 162.031, "actual expenses directly related to the construction or repair of the improvement," include overhead and other expenses which, *though not readily traceable to a particular job, are necessary to obtaining or completing the job,* so long as the expenses are "actual," i.e., have in fact been incurred.

Tex.Atty. Gen. Op. JM–945 at 4164 (emphasis added).

In the present case, we do have payments tied to *a particular job,* as the debtor continually reminds us, but the payments are essentially for compensation to the owners of the business.[16] We must note that monies removed from a business do not appear, either facially or after a review of JM–945, to be the same as "actual expenses." We also note that if those payments to the debtor were made later in time—that is, when Airtron had actually presented a bill rather than at a time before Airtron even got involved in the project—there would be little doubt that all parties would recognize the true nature of the conduct, that is, that the debtor had favored himself over his subs and thus violat-

---

**16.** Indeed, the debtor candidly admitted in a brief that "[t]he commissions to Houser and Faulkner were in lieu of a salary." Defendant's Brief [# 42–1] in Response to Plaintiff's Brief of Authorities Regarding Complaint Objecting to Dischargeability, at 3 (June 21, 1997).

 

ed chapter 162.[17] In that light, it is difficult to see why the passage of time should change our construction.

Were we, in fact, to read chapter 162 as the defendant suggests, there would be very little of a contractor's expenses that would *not* be sheltered by § 162.031(b). The exception would quickly swallow the rule. All the money spent by a debtor in the construction business would become expenses that fall into the exception created by § 162.031(b). We simply do not believe that the Texas Legislature, in enacting § 162.031 ever intended to eviscerate the Texas Construction Trust Fund statute in this manner, and therefore reject the debtor's proffered interpretation.

### Conclusion

The court has determined that Airtron's cause of action for nondischargeability under section 523(a)(4) has not been established, because the requisite level of "mental culpability" for purposes of a defalcation finding has not been established. Accordingly, the court will enter a take nothing judgment in favor of defendant. A separate form of judgment will be entered on even date.

So **ORDERED.**

### Judgment

CAME ON for trial on July 23, 1997 the above styled adversary proceeding. Upon consideration of the evidence admitted at trial, the arguments of counsel and relevant authorities, the court entered its decision, incorporating therein its findings of fact and conclusions of law, pursuant to Federal Rule of Bankruptcy Procedure 7052. Consistent with the court's ruling, judgment shall hereby be rendered for Defendant and therefore,

IT IS ORDERED, ADJUDGED AND DECREED that Plaintiff take nothing and that the debt in question is dischargeable in the defendant's chapter 7 bankruptcy case.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that all other

relief requested in this adversary proceeding not granted herein above is hereby denied.

---

**17.** It would seem a rather strange result indeed if we were to allow "profit" withdrawals from construction payments if the general contractor had enough foresight to always get paid from the first construction payment while disallowing payments that were made after all the subcontractors had incurred expenses.